

FILED

FEB 1 8 2020

Clerk, U.S. District Court
Texas Eastern

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| HARMON L. TAYLOR, | § | Case No. __4:20cv114-RWS-KPJ__ |
| | § | |
| Non-fiduciary, non-consenting political "target," | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO CONSENT TO ARBITRATION |
| | § | |
| CITY OF SHERMAN, a municipal corporation, | § | |
| | § | |
| BRANDON SHELBY, City Attorney, officially and individually, | § | NO CONSENT TO NON-JUDICIAL DECISION-MAKING |
| | § | |
| CODY SHOOK, Police Officer, officially and individually, | § | JURY REQUESTED |
| | § | |
| FNU LNU, a/k/a ALEX AVILES Assisting Officer, officially and individually, | § | |
| | § | |
| ZACHARY FLORES, Chief of Police, officially, | § | |
| | § | |
| BOB UTTER TOWING, | § | |
| | § | |
| DRIVER, | § | |
| | § | |
| DRIVER'S ASSISTANT, | § | |
| | § | |
| MIDWAY STORAGE FACILITY, | § | |
| | § | |

---

T. SCOTT SMITH,                                      §
    Judge, Municipal Court, Sherman,      §
    officially and individually,           §
                                           §
SUSAN MORRIS,                                        §
    Clerk, Municipal Court, Sherman,       §
    officially and individually,           §
                                           §
JANIE FLETCHER,                                      §
    Clerk, Municipal Court, Sherman,       §
    officially and individually,           §
                                           §
MUNICIPAL COURT ASST.                               §
    PROSECUTOR                             §
    (Nos. 1700002951, 52, 53, 54,          §
    and 4472),                             §
    officially and individually,           §
                                           §
                                           §
GRAYSON COUNTY, TEXAS,                              §
                                           §
CAROL M. SIEBMAN                                     §
    Judge, County Court at Law No. 2,      §
    Grayson County,                        §
    officially and individually,           §
                                           §
MICHAEL SISSNEY,                                     §
    Prosecutor, Muni. and CCL2,            §
    officially and individually,           §
                                           §
MATT RALSTON,                                        §
    Asst. Prosecutor, CCL2,                §
    officially and individually,           §
                                           §
                                           §
WHITNEY BREWSTER,                                   §
    Exec. Dir, TX DEPT OF                  §
    MOTOR VEHICLES,                        §
    officially and individually,           §
                                           §
    Non-beneficiary, consent-compelling    §
    political agitator,                    §
                                           §

| | |
|---|---|
| [STATE OF TEXAS, *See* state<br>    District Court filing] | §<br>§<br>§ |
| | § |
| RON CLARK, | § |
|     Chief Judge (at the time), E.D.Tex., | § |
|     officially and individually, | § |
| | § |
| AMOS L. MAZZANT, III | § |
|     assigned § 451 judge, E.D.Tex., | § |
|     officially and individually, | § |
| | § |
| CHRISTINE A. NOWAK, | § |
|     designated **but unconsented-to** | § |
|     magistrate, i.e., arbiter, | § |
|     officially and individually, | § |
| | § |
| | § |
|     and | § |
| CARL E. STEWART, | § |
|     Chief Justice (at the time), USCA5, | § |
|     officially and individually, | § |
| | § |
|     Respondents. | § |

## ORIGINAL COMPLAINT

COMES NOW HARMON L. TAYLOR (Taylor), Plaintiff, who asserts as

follows:

## Table of Contents

ORIGINAL COMPLAINT ............................................................................... 3

Table of Authorities ..................................................................................... 5

Subject Matter Jurisdiction –§§ 1331, 1367 ............................................. 8

Personal jurisdiction .................................................................................. 10

Venue ........................................................................................................... 10

The political setting and backdrop ........................................................ 11

    "Sovereignty," thus "domestic terr*rism," and the notion of "consent." .......... 11

        The Texan and American side of the matter. ...................................... 11

        The Nazi and Communist side of the matter. ..................................... 14

    What is the nature of the agreement being enforced? ...................................... 22

    How, then, is such trust agreement formed? ................................................... 23

    The confirmation of the "consent" element – *Lozman* (2013). ........................ 26

        "Vessel" defined .................................................................................. 26

        "Vehicle" defined. ............................................................................... 31

The material facts of June 18, 2017 – The conspiracy begins .................................... 32

    No "transportation." ......................................................................................... 32

    No "consent." .................................................................................................... 34

        Not via the van … ............................................................................... 34

        … And Not via Taylor. ......................................................................... 34

    No "transportation" + No consent" = No **"vehicle."** ....................................... 35

        "Vehicle" defined – A Reprise. ............................................................. 35

        The four core terms for "transportation." ............................................ 36

    No Probable Cause. ........................................................................................... 38

Despite those controlling facts and principles, here's what happened ...................... 39

Taylor's immediate response was to mitigate damages ........................................... 46

The municipal court proceedings ............................................................................ 59

Then came the county court proceedings ................................................................ 66

Then came the dismissal. ....................................................................................... 71

Taylor's Claims ...................................................................................................... 72

    "Constitutional" challenges. ............................................................................. 72

    Malicious Prosecution. ..................................................................................... 73

        No "transportation." ........................................................................... 79

        No "consent." ....................................................................................... 80

        Thus, no "vehicle." .............................................................................. 80

Destruction of evidence; Conversion – Taylor's taggage. ................................ 86

Conversion of Taylor's van. ............................................................. 86

Fraud................................................................................. 89

Violation of right to be free from unreasonable seizure. ................................ 91

Violation of right not to contract / agree / consent. .......................................... 93

Violation of right not to exercise a privilege. ................................................. 95

Failure to train / supervise – violation of right to be free from unreasonable
    seizure. ........................................................................... 97

Failure to train / supervise – violation of right not to contract / agree /
    consent........................................................................... 100

Failure to train / supervise – violation of right not to exercise a privilege.
    ................................................................................... 103

Violation of right of access. .............................................................. 106

Violation of right of Structural Due Process. ................................................. 114

Request for Relief .......................................................................... 122

§ 1746 Declaration – HARMON L. TAYLOR........................................... 122

Certificate of Service ....................................................................... 123

## Table of Authorities

### Cases

*Bailey v. Alabama,*
    219 U.S. 219, 31 S. Ct. 145, 55 L. Ed. 191 (1910). ........................................... 22

*United States v. **Berheide**,*
    421 F.3d 538 (7th Cir. 2005). .......................................................... 22

*Bivens v. Six Unknown Named Agents,*
    403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). .....8, 91, 93, 95, 107, 114

*Brown v. Oaklawn Bank,*
    718 S.W.2d 678 (Tex. 1986).......................................................... 22

*King v. Burwell,*
    576 U.S. 988, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015). ................................ 18

*Lozman v. Riviera Beach,*
   568 U.S. 115, 133 S. Ct. 735, 184 L. Ed. 2d 604 (2013). ............................ 26, 31

Marzett v. State,
   2015 WL 3451960 (Tex. App.–Dallas 2015, writ ref'd 2016) (Nos. 05-14-01570-
   CR, -01571-CR, -01611-CR, and -01612-CR). ..................................................... 16

Perkins v. State,
   No. 15-0594 (Tex. 2016) (Den'd Sept. 25, 2016) (**Perkins I**) ........................... 70

Perkins v. State,
   No. 16-0247 (Tex. 2016) (Den'd July 8, 2016) (**Perkins II**). ........................... 70

*Roell v. Withrow,*
   538 U.S. 580, 123 S. Ct. 1896, 155 L. Ed. 2d 775 (2003). ............................... 59

Stevens v. State,
   No. 16-0248 (Tex. 2016) (Den'd Jun. 24, 2016). ............................................. 70

Taylor v. State,
   No. 18-0663 (Tex. 2018) (Den'd Sept. 21, 2018) (**Taylor V**). ........................... 70

**Statutes**

1 U.S.C.A. § 3. ................................................................................................. 26

28 U.S.C.A § 451. ........................................ 50, 53, 55, 57, 107-110, 113-115, 117, 118

28 U.S.C.A. § 636(b)(1)(A). ........................... 51, 57, 109, 110, 116, 117, 120

28 U.S.C.A. § 636(c). ............................................................... 108, 109, 116

42 U.S.C.A. § 1983. ......................................... 8, 91, 93, 95, 107, 114

Tex. Fin. Code § 392.301(a). ................................................................ 22

Tex. Penal Code § 32.43 (commercial bribery) ........................................... 22

Tex. Rev. Civ. Stat. Ann. art. 5069-11.02 (1986) ..................................... 22

Tex. Transp. Code Ann. § 24.013(f)(2) (West 1999 & Supp. 2006) (operate /
   aircraft). ........................................................................................... 36

TEX. TRANSP. CODE ANN. § 501.002(17) (eff. Jan. 1, 2012) (motor vehicle). ............. 37

TEX. TRANSP. CODE ANN. § 502.001(24) (vehicle). ................................................. 31, 35

TEX. TRANSP. CODE ANN. § 502.001(25) (eff. Jan. 1, 2012) (motor vehicle). ............. 37

TEX. TRANSP. CODE ANN. § 502.001(45) ("vehicle"). ............................................. 31, 35

TEX. TRANSP. CODE ANN. § **522**.003(11) (drives). ...................................................... 37

TEX. TRANSP. CODE ANN. § 522.003(21) (motor vehicle). ........................................... 37

TEX. TRANSP. CODE ANN. § 541.001(1) (operator / vehicle). ....................................... 36

TEX. TRANSP. CODE ANN. § 541.201(11) (motor vehicle). ........................................... 37

TEX. TRANSP. CODE ANN. § 601.002(5) (motor vehicle). ............................................. 37

TEX. TRANSP. CODE ANN. § 601.002(8) (operator / motor vehicle). ............................. 36

TEX. TRANSP. CODE ANN. § 621.001(9) (vehicle). ................................................... 31, 35

TEX. TRANSP. CODE ANN. § 642.001(1) (motor vehicle). ............................................. 37

TEX. TRANSP. CODE ANN. § 642.001(2) (operator / motor vehicle). ............................. 36

TEX. TRANSP. CODE ANN. § 647.001(4) (motor vehicle). ............................................. 37

TEX. TRANSP. CODE ANN. § 647.001(5) (operator / motor vehicle). ............................. 36

TEX. TRANSP. CODE ANN. § 683.001(4) (motor vehicle). ............................................. 37

TEX. TRANSP. CODE ANN. § 724.001(11) (operate / motor vehicle). ............................. 36

TEX. TRANSP. CODE ANN. § 728.001(2) (motor vehicle). ............................................. 37

TEX. TRANSP. CODE ANN. § 741.201(23) (vehicle). ................................................... 31, 35

TEX. TRANSP. CODE ANN. § 750.003(a) (vehicle). ................................................... 31, 35

**Web pages**

< https://www.marxists.org/archive/marx/works/1848/communist-manifesto/
    ch02.htm > ................................................................................................. 18

**Subject Matter Jurisdiction –§§ 1331, 1367**

1.   28 U.S.C. § 1331 – Federal question.

    a.   This matter arises at its base from the systemic harassment, intimidation, and/or retaliation against Taylor, under color of law and office, for Taylor's exercise of his "right *not* to contract" and his exercise of his "right *not* to exercise a privilege," namely "driving."

    b.   This matter also encompasses his rights to be free from unreasonable seizure, namely his van (modest, basic, seven-party, family-sized).

    c.   The rights violation claims arise under 42 U.S.C.A. § 1983 and *Bivens*.

2.   28 U.S.C. § 1367 – Supplemental Jurisdiction.

    a.   Taylor also asserts claims arising under state law.

    b.   The timing is due to the Malicious Prosecution of Taylor, in which CITY and COUNTY, acting at all times in STATE's name, engaged, and in support of which all U.S. officers have acted.

        i.   Malicious Prosecution doesn't arise just because all the state court matters were dismissed. *See* Exs. 1 to 5.

        ii.   It arises because *not one* of those claims *ever* had Probable Cause.

        iii.   It arises because not one of those charges was ever even remotely possible for STATE *to* win, as a matter of law, due to the wholesale lack of jurisdiction.  *See* Exs. 6 and 7.

        iv.   No state court had jurisdiction over those "transportation"-based

                         charges, because there was never a commercial nexus *to* enforce.

      v.      Taylor ***repeatedly*** gave Notice of that fact, namely no commercial nexus, including sworn Affidavits *and* copies of the Walker County rulings, *again see* Exs. 6 and 7, but not one of these parties Respondent *cared* about the **facts**, *just* the politics, just the political indoctrination encouraged witch hunt against someone who dared to compel this system to recognize and apply its very own laws.

    c.    Taylor's state law claims arise out of the same facts that give rise to the claims raising federal questions.

3.    Taylor delivered, and each party Respondent received, Taylor's demand letter(s) relevant to this matter. Exs. 8, 9, and 10.

    a.    In fact, SIEBMAN received hers twice, and *both* times directed the County Clerk's Office to return it.

    b.    The "reason" she used for returning it, *twice,* is that this demand letter wasn't a filing for any active case.

    c.    SIEBMAN never provided any other address, and there is no other address for her in the State Bar address information, meaning the only address available for her is the business address at the courthouse.

**Personal jurisdiction**

4.      All parties Respondent have at least "minimum contacts" with the forum
        state.

5.      All parties Respondent transact their commercial activity, in whole or in
        material part relevant to this case, within TEXAS and within GRAYSON
        COUNTY.

6.      All actionable conduct occurred, or was delivered by mail to an address
        within, TEXAS and within GRAYSON COUNTY.

7.      All parties Respondent except STEWART may be Served at locations within
        the jurisdictional boundaries of TEXAS.

8.      STEWART, (then) Chief Justice USCA5, is within the reach of the long arm
        statute, given his more than "minimal contacts" with the forum state, via his
        multiple rulings and related commercial interactions regarding matters
        arising in TEXAS, including those arising in GRAYSON COUNTY.


**Venue**

9.      All events occurred within TEXAS and within GRAYSON COUNTY or
        regarding parties resident within TEXAS and within GRAYSON COUNTY.

10.     All property involved was located within TEXAS and within GRAYSON
        COUNTY.

11.     All damages were incurred within TEXAS and within GRAYSON COUNTY.

**The political setting and backdrop**

<u>"Sovereignty," thus "domestic terr*rism," and the notion of "consent."</u>

THE TEXAN AND AMERICAN SIDE OF THE MATTER.

12.  Ever since the malevolent destruction of the Murrah Building, part of the law

enforcement focus, and certainly of the national security focus, has been on

this concept called "domestic terr*rism."

13.  It happens that Taylor was humbled and honored to represent the Survivors

of the Murrah Building bombing, via two key spokespeople, *both* of whom

where *in* the building as it was being destroyed *(from inside)*, [1]  in litigation

in Terre Haute, Indiana, in full support their effort to preserve evidence.

That's just to say that Taylor has an intimate understanding of that matter,

which perspective is in direct contrast to and with the "popular" renderings of

what happened there and why.

14.  The 7th Circuit's ruling on appeal of that matter changed not only Taylor's

career but also his life.  The fundamental learning from that experience

caused/compelled Taylor to reexamine "everything" in the way of standard

presumptions regarding legal matters.  *Knowledge compels responsibility.*

---

[1] [←] Just two vignettes, very, very briefly. (Warning: graphical depiction.) In the
Oklahoma *state* court proceeding, Nichols was charged with one count of (illegal)
abortion.  Based on what facts? ***Heavy*** glass rocketing *out from* the building
practically cut in half the pregnant woman standing within that first half-block,
causing rather quickly her death *and* that of her "quickened" fetus. Ground-based,
*external*, "point" sources *don't* cause/create *vacuum* effects.
  As proved by the recording made in the administrative hearing across the street,
the people of OKC experienced ***two*** explosions that morning, not one. There was,
then, scienter in "demonizing" McVeigh so as to "compel" transfer of venue.

---

15.   One of those areas of re-examination is "transportation."

16.   As a result of that re-examination into "transportation," Taylor realized that *commercial* regulatory authority was constantly being applied to *non*-commercial activity, i.e., *well* beyond the obvious limits of "transportation."

17.   Applying that understanding, Taylor defended the "no license" "ticket" issued to him in January, 2007, in Walker County (Huntsville, county seat), Texas.

18.   At that early stage of this effort, his defense was, "I'm not in 'transportation.'"

   a.   The verb in the definition of **"vehicle"** is "transported;" thus, Common Sense says that negating "transported" negates **"vehicle."**

   b.   "Transportation," being *commercial* in nature, couldn't happen without exchange of "money," of which there was none for this *non*-commercial setting and matter.

19.   One member of Taylor's administrative advisory panel in the municipal court proceeding *held out for* "jury nullification," but *was finally persuaded, via* judicial answer to the panel's question, that such wasn't really applicable to a TRANSP. CODE matter. They resolved it with a "conviction." Taylor appealed from that court of non-Record, which activated a trial *de novo*.

20.   Some things (most) unbecoming to the bench occurred during the *de novo* pre-trial phase(s). Thus, Taylor sued several people, starting with that judge, and the end result is that the case, still pre-trial, was shelved for 10 years.

21.   Reactivated in 2017, by "delayed" but effective "change of venue" (i.e., same court, new judge), that case had two very material commercial fact changes:

a.   The van, having been traded in for a newer model, had been "salvaged."

b.   Taylor had terminated the last "Certificate of Title" trust in his name.

22.   The van's showing up as "salvaged" means that it was declared "worthless." There can't be a "Certificate of Title" trust without a trust *res*.

a.   For most "transportation" matters, the termination of the trust, *as a matter of law, via the "worthlessness" of the trust res*, would terminate the relevant commercial nexus, and STATE's "standing" would end.

b.   But, this was a "no license" matter, meaning that a relevant commercial nexus could be any "Certificate of Title" in Taylor' name.

23.   *So, the additional fact that Taylor had terminated of the last* "Certificate of Title" trust in his name is what it took to establish the complete defense.

24.   The (new) county judge, seeing that the trust regarding the *van* had terminated, as a matter of law, and that the last trust involving *Taylor* had been terminated, granted

a.   not only Taylor's First Amended Special Appearance, confirming the court's lack of *personal* jurisdiction, i.e., that Taylor was no longer liable in the fiduciary capacity, *again see* Ex. 6,

b.   but also Taylor's First Amended Plea to the Jurisdiction, confirming the court's lack of *subject matter* jurisdiction, i.e., that STATE no longer had "standing," i.e., no longer hand any commercial nexus *to* enforce, for which *again see* Ex. 7.

---

### THE NAZI AND COMMUNIST SIDE OF THE MATTER.

25.   Also developing during this 10-year period was a defense, apparently asserted in state courts across the country, called "sovereignty."

26.   "Sovereignty" appears to be an ambassadorial-level "immunity" defense, based on a treaty(ies) that has(have) simply never existed.

   a.   One example.  There is no known treaty between UNITED STATES and (the) "Kingdom of Heaven."  Hence, there are no such "ambassadors;" meaning there is no such ambassadorial "immunity."

27.   Somewhere in there, FBI and SPLC got into the act by promulgated training materials for state (and apparently national) officers associated with "transportation" enforcement, i.e., officers, prosecutors, judges, etc.  What these materials "teach" is that all "sovereigns" are "domestic terr*rists" and that one ear-mark of a "sovereign" is the challenge to jurisdiction in "transportation" matters.

28.   The politically indoctrinated "logic" is this: Since all "sovereigns" challenge jurisdiction in "transportation" matters (not known to be true), and since all "sovereigns" are "domestic terr*rists" (*absolutely known to be false*), all those who challenge jurisdiction in "transportation" matters are "sovereigns" (facially insupportable *and* self-proved here to be absolutely false) and, therefore, "domestic terr*rists."

29.   Taylor was so stigmatized, starting very early in the "transportation" stop, which ***outrageous*** stigmatization is libelous and slanderous, and damaging

as such, but largely inactionable *as* libel or slander, *directly*, due to the litigation "privilege."

30. In a nutshell, the politically indoctrinated "logic," thus *legal position*, is this: Anyone challenging jurisdiction in a "transportation" matter is a "sovereign," thus a "domestic terr*rist," *by (politically indoctrinated) definition*.

31. While the conditional and contrapositive will have the same truth result, and while the converse and the inverse will have the same truth result, getting from condition to either converse or inverse is not direct.

    a. The only way to make the connection between the conditional and either the converse or the inverse is to comprehend the law, and

    b. what these parties Respondent confess is that their politically indoctrinated inability to think logically is surpassed by their incompetence and lack of desire to understand the law.

    c. Politics is just *so* much easier. Since the "thinking" is already supplied, one is then self-justified in abdicating one's responsibility to think.

32. It's a *Nazi* tactic to stigmatize the opposition *politically*. To the Nazis, that political stigmatization is more than adequate substitute for actual ***facts***.

33. In short, then, what FBI/SPLC "training" sessions/materials do is indoctrinate politically state (and apparently also national) executive and judicial officers into seeing "sovereigns" everywhere they look, even where there is no such "sovereign" anywhere in sight. The FBI/SPLC has basically been "approved" to Nazi-fy those associated with "transportation" enforcement.

34.   FBI/SPLC materials and sessions don't teach law or legal principles, just political indoctrination.

35.   That indoctrination programme depends heavily on the premise that the session attendees are either not Texan enough or American enough or lawyer enough to filter it out.

36.   Case in point.

    a.    Among the various, *multiple*, State v. Perkins matters, *see*, in particular, Nos. 03-17-00049-CR to 53-CR, 3d.CoA (Austin) (Perkins v. State, on appeal).

    b.    In that matter (those matters), there was the muni. court trial (of Record) and the appeal to the County Court.  The County Court's (outrageous) ruling was then appealed to the 3d.CoA.

    c.    What the AUSTIN City Attorney's employee argued, on appeal, in a motion for *sanctions*, in an appeal in which Perkins was *confirmed* in his position (that the County Court's "ruling" was a non-ruling), is that Perkins was a "domestic terr*rist." *See* Ex. 11, City's/State's Motion for Sanctions, p.3 n.1.

    d.    What is Perkins's defense?  Same as Taylor's: no commercial nexus, which defense is essentially on the other side of the *galaxy* from this so-called "sovereignty" ("I'm 'immune,' because I'm not a 'person;' therefore I'm not subject to your laws") defense. *Cf., e.g.*, Marzett.

---

37.    Case in point.

    a.    Fairly early into the no-Probable-Cause stop of Taylor, the ticketing / car-seizing officer was *very* quick to stigmatize Taylor as a "sovereign."

    b.    That stigmatization carried through the *muni.* court proceedings.

    c.    That stigmatization carried through the *county* court proceedings.

38.    Given the FBI/SPLC political indoctrination programme, the very *notion* of "consent" is anathema.  That there's any "consent" involved is an idea that's shunned at the very threshold.  Those asserting that "transportation" is in *any* way "consent" based, ***are*** instantly, politically stigmatized. "Consent" is specifically and instantly rejected as being ***any*** part of the legal formulation.

39.    As one reflects on this, one sees that this political indoctrination programme is in no way accidental.  To understand "consent" is to understand what exposes a whale of a lot more problems than just those associated with the "transportation" system.  It exposes the legal mechanism undergirding the entire Communist agenda.

**One more time – how Sixth Plank "transportation" enforcement works**

40.    In order that the material facts in this matter be understood for what they are as they are presented, it makes sense to cover, one more time, the reality about how this Sixth Plank "transportation" enforcement mechanism works.

41.    The Sixth Plank.

    "Centralisation of the means of communication and transport in the hands of

the State," [2]  < https://www.marxists.org/archive/marx/works/1848/communist-manifesto/ch02.htm#129 >, i.e., the centralized national governmental authority.

42.   Communism is very much alive and well in UNITED STATES.

    a.   Those who balk at that confess having no clue what Communism is.

    b.   Every single one of the top Ten Planks is active in UNITED STATES.

    c.   Plus, there's centralized banking, which is Communism.  PP[C]ACA, i.e., "Obama Care," is centralized health care, which is Communism. The "government" "owns" the auto manufacturing industry.  That's Communism (just another angle on the Sixth Plank).

    d.   What President Trump has made historic inroads eliminating are various strangle-hold policies on commercial activities in this nation, which strangle-hold policies are implementation of pure Communism in principle.

43.   America almost died out in the beginning, directly due to Communism.

    a.   Communism is in no way new to America, and it wasn't *invented* by Marx, *or* Engels, *or* Stalin, *or* Mao Tse Tung, etc.

    b.   Communism was in the theme of the Mayflower Compact: *from* each according to his ability; *to* each according to his need.

    c.   It's in no way accidental at present that the 4th Quarter marketing shifts immediately from Halloween to Christmas.

        i.   The early colonists, all dutifully going about their Communistic

---

[2] [←] *King* (regarding PP[C]ACA ("Obama Care") "Exchanges."

days, were dying out.

ii.     While there *was* a notable contribution by the Native

Americans, what made *that* contribution work was the

foundational shift away from Communism and into Scripture-

based private property coupled with laissez faire economic

policies.  Recognition of what was whose, and that one could

expect to keep or sell what one grew, manufactured, made, etc.,

completely turned that situation around, literally death to life.

iii.    The label for the annual celebration of the formal, commercial,

practical, philosophical *end* to the earliest of Communist

experiments in America is Thanksgiving.

iv.     What those presently with the predominant access to the

microphones and printing presses want Americans to forget is

just exactly what changed and why.

v.      Thus, as one realizes that the popular marketing in "all" the

stores goes instantly from Halloween to Christmas, with the

intent of removing Thanksgiving from the mind, thus,

ultimately, from the calendar, just know that Communism is

back, and very much alive and well in UNITED STATES.

44.   Since there are on the order of a *million+* graves (and burials at sea) around

this globe of Americans who have died in armed conflict, risking their very

lives *so as to prevent* such concepts, ideologies, policies, as Communism, from

*ever* gaining a foothold in "government" here in The States, how is it in any way even *possible* for Communist policy to exist here?

45. To answer that, of the several possible analogies, that one that seems to be the most readily understood is the one about Sharia law.

    a. Contrary to popular perception, the high court of Great Britain didn't lose its mind by recognizing Sharia law as enforceable in Great Britain any more than the high courts in the states' doing the same under the state law.

    b. To limit a party's choice of law is to infringe on the fundamental right to contract.

        i. So, unless there's a war going on, which already compels limiting one's choice of law, Sharia law *has* to be allowed.

        ii. To disallow it, or to boycott it, is to declare war against it, and that's the same problem, just going the other way.

    c. Thus, those who have *consented* to the application of Sharia law will have their day in court in Great Britain, and in the states, and Great Britain, and the states, will enforce those matters, even if the judges all get up at the end to go vomit.

46. So, how is it, then, even *remotely* possible for Communism have **any** force or effect in this nation, at all?  And, the answer is the very same as with Sharia law: by the consent of the "target."

47. Specifically, then, centralized "transportation" is Sixth Plank policy.  How

does Sixth Plank policy apply?  By the consent of the "target."

48.   We all have a duty to "know the law." For and by this reason and policy, even where the individual is suckered unknowingly into consenting to Communist policy, that *agreement is fully enforceable. We have a duty to "know the law."*

49.   It's precisely because we're dealing with *commercial* Communism that the matter is entirely beyond the reach of DoD to touch.  If it were "violent," then it'd be a DoD matter.  But, it's not "violent."  It's "commercial."

50.   There's one and only one person on this planet in a position to do something about all this commerce-based Communism, and that's the individual subject to it. That's it.  It's designed to be bought into individually, making it an individual's problem to solve.  The only one in a position to terminate one's commercial obligations is the one who has them.

51.   The solution is found in the taking of individual responsibility.

52.   Once one snaps to the reality that we're drowning in Communism, via its *commercial* deployment, that leaves only a couple of questions:

   a.   What is the nature of the agreement being enforced?, and

   b.   How is such trust agreement formed?

<u>What is the nature of the agreement being enforced?</u>

53.   The greatest clues are the enforcement provisions.

    a.   There are only two forms of agreements: contracts and trusts.

    b.   And, breach of contract isn't a crime.

        i.   TEX. FIN. CODE § 392.301(a) (prohibited debt collection practices);

        ii.   *Brown v. Oaklawn Bank*, 718 S.W.2d at 680-81 (applying TEX. REV. CIV. STAT. ANN. art. 5069-11.02 (1986)) (charging debtor (car buyer) with theft is a prohibited debt collection practice);

        iii.   TEX. PENAL CODE (no crime based on mere breach of contract).

        iv.   *Cf. Bailey* (breach of contract can't be, and wasn't, criminalized).

        v.   *Accord Berheide*, 421 F.3d at 540 ("[B]reach of contract is not a crime.").

    c.   That leaves trust.

    d.   It happens that breach of trust *is* subject to enforcement via criminal sanctions. TEX. PENAL CODE § 32.43 (commercial bribery) (i.e., criminal breach of trust).

54.   So, in this "transportation" context, since what's marketed to the people of this nation is the constant threat of *criminal* sanctions, *that's* the clue that confirms the nature of the "transportation"-based commercial nexus. It *has* to sound in trust.

55.   There exist only two choices, contracts and trusts, and breach of contract *may*

*not* be enforced with criminal sanctions, while breach of trust *may*.

56. In general, while it *is* a wicked paradigm shift, it's also our present legal reality that *every* criminal sanction provision codified outside that jurisdiction's penal code can be activated one and only one way: by consent of the "target" via the relevant trust agreement.

57. Applying that, we have this:

    a.    In TEXAS, the TRANSP. CODE is codified outside the PENAL CODE.

    b.    The TRANSP. CODE is chalk full of (threats of) "criminal sanctions."

    c.    Therefore, one knows, instantly, on the face of the matter,

        i.    that the TRANSP. CODE applies, in any part of it, if and only if the "target" has consented to it, and

        ii.    that the relevant consent is found in a trust agreement.

How, then, is such trust agreement formed?

58. All that remains is figuring out how one is clandestinely seduced into the "transportation" agreement.

59. That clandestinely seduced trust agreement happens at the instant the car is first purchased.

    a.    On the commercial side, there's not a moment's hesitation in understanding that the bank wants to get paid for loaning the money by which the car is purchased. So, as part and parcel of that extension of credit, the bank has set up a rather elaborate method of at least

*trying to preserve the collateral long enough to get paid.*

   b.     And, in all of that is the hiding of the trading of the "full title" for the "legal title only."

60.   Who owns the car in full title?  The manufacturer.

   a.     *To take raw materials and to build something with those is to have* "full title" in whatever is made.

   b.     Thus, in this entire line of documented ownership, it's the manufacturer, and only the manufacturer, who is in a position to assert "full title" to the car.

   c.     And, that's exactly what the Manufacturer's Statement of Origin (MSO) is, namely confirmation of "full title" in the manufacturer.

61.   The buyer who takes possession of that document, namely the MSO, has "full title" to that car.

62.   But, the buyer who trades that "full title" for "title" paperwork produced by someone other than the manufacturer trades "full title" for something considerably less than "full title."

63.   What *possible* interest does *DMV* have?  Is DMV one of the "governmentally owned" manufacturers?  Nope. Sure isn't.  So, what ownership interest could DMV *possibly* have?  What "title," in whole or in part, could DMV possibly "certify" by means of their "Certificates of Title?"

   a.     And, here's the answer.  Once the buyer is seduced into trading his "full title" for that "Certificate of Title," that buyer no longer owns "full

title" but rather "legal title only."

64. There can't be two documents of "full title." That would be fraud.  And, *the* "full title" can't come from anywhere other than the manufacturer.  So, the Manufacturer's Statement of Origin *is* the "full title."

    a.    This mislabeling is in no way accidental.

    b.    To label it correctly, as "full title," *openly*, is to have this Sixth Plank scheme self-revealed.

65. So, the continuation of this intentional mislabeling is via what DMV provides, which, as just self-proved, can't be the "full title," but is a "certificate" of *some* type of interest for which "title" *is* a suitable labeling. What kind of title is there that's title but not "full title?"

    a.    That's one of two things: legal title or equitable title.

66. On the first pass, it doesn't matter which, because what the reality of "something less than full title" means is that one has set up a trust.

67. On second pass, though, *it does* matter, because the party needs to know which role he's just signed up for in that fiduciary relationship.

    a.    Since it's the fiduciary who is subject to criminal sanctions for intentional breach of a fiduciary duty, it follows that the former "full title" owner has become the "legal title" owner, i.e., the fiduciary.

68. There you have it, one more time.  This is how the "transportation" enforcement mechanism is set up.

    a.    The first buyer of the car opts to trade "full title" for "legal title only,"

b.　and what's traded from then on is the "Certificate of Title."

c.　All that happens from there is the changing out of the fiduciaries of the trust for which the car is the trust *res* and DMV the (main) beneficiary.

The confirmation of the "consent" element – *Lozman* (2013).

69.　The Walker County judge understood *Lozman* (2013). *See again* Exs. 6 and 7.

70.　Since the Respondents in this matter don't, yet, let's review it, again.

71.　In *Lozman* (2013), S.Ct.U.S. confirms that the U.S. trial court never had jurisdiction over Riviera Beach's *in rem* maritime claim against Lozman's floating house.

a.　To establish that conclusion, they construed "vessel."

"VESSEL" DEFINED.

i.　A "vessel" includes "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C.A. § 3.

b.　"Vessel" has a two-part, disjunctive verb clause.

i.　The first part, "used," asks whether there's actual "transportation" activity going on.

ii.　The second part is the "coulda," "shoulda," "woulda" part: "or capable of being used." This is the part "everyone" construes to mean and refer to physical, mechanical design. But, if *that* were

---

the *proper* construction, Lozman would have lost.

    iii.   This second part is the "pirate speak" part drafted into the legislation with the *intent* that it *be* deceiving; it *actually* "asks" whether the "target" has consented to being regulated.

c.   It's from the analysis of this two-part verb clause that one confidently concludes this formulation:

No "transportation" + No "consent" = No "<u>vessel</u>."

d.   They also did something they never do: recite the trial court case style.

e.   It's a perfectly legit maritime, *in rem* case style.

f.   So, why here?  Why now?

g.   The *professional grade* lawyers in the crowd come to realize that the case style isn't recited to show us what's ***there***, but rather to show us what's ***missing***.

h.   Riviera Beach had sued a *description* of Lozman's floating house, while asserting *jurisdiction* that it was a "<u>vessel</u>."  That entire case is about the question of whether that floating house was "<u>vessel</u>," and the answer is, "No, it isn't."  Since it's not a "<u>vessel</u>," there's no jurisdiction.  Why is it not a "<u>vessel</u>?"

i.   (Deliberately skipped.)

j.   "<u>Vessel</u>" has the two verb clauses.  The first asks about actual transportation activity.

    i.   S.Ct.U.S. defines "transportation" as "carrying passengers or

cargo." They go into a lengthy discussion about how they/we know that Lozman was not "carrying passengers or cargo." Bottom line, the facts didn't satisfy the first verb clause.

k.  That leaves the second verb clause, which is the "coulda, shoulda, woulda" verb clause.

    i.  *"Everyone"* "reads" (construes) that "coulda, shoulda, woulda" clause as a physical or mechanical design feature. Can/Could that water-going conveyance, physically, mechanically, be used to carry passengers or cargo?

    ii.  If a water-going conveyance is capable of carrying even one anything, say, sunglasses for sale, and where the party using that conveyance, e.g., a surf-board, ice chest, etc., gets paid to do that, then that water-going conveyance *is* a "vessel."

    iii.  That "read" renders pretty much anything that floats a "vessel," because any water-going "thing" "coulda, shoulda, woulda" been used for that form of commercial activity.

l.  *(Deliberately skipped.)*

m.  But, that's obviously the wrong analysis, or else Lozman would have lost. He won. Therefore,

    i.  we're not talking simply about physical, mechanical design;

    ii.  it's something *else*, and we know what that something *else* is per realizing what's *missing* in that recited case style.

n.   Riviera Beach alleged that Lozman's floating house was a "<u>vessel</u>," but they sued a *description*, not an "M/V  (name) ."

o.   (Deliberately skipped.)

p.   While "M/V" commonly means "motor vessel," it's not the "motor" part that matters anything like as much as *how* one gets the "name" in the first place.

    i.   In the maritime context, to get a "name" for a water-going conveyance, one "*registers*" it.

    ii.   While the consequences of the act of "registration" of a *water-going* conveyance is some more readily understood by its counterpart in the *land*-going conveyance context described above (MSO, "Certificate of Title"), it's the exact same process, with the exact same legal consequences.

    iii.   Where, in the *land*-going conveyance context, what happens in the clandestine paperwork shuffle shenanigans is the formation of a trust relationship, in the *water*-going conveyance context, that trust relationship is formed via the act of "registration."

    iv.   Those who *do* "register" the names for their water-going conveyances thereby "consent" to being fiduciaries for purposes of maritime "transportation" enforcement mechanisms.

q.   Riviera Beach had no "M/V  (name) " *to* sue, because Lozman never "registered" his floating house.  (It turns out that Lozman's floating

---

house was a DIY project.  Thus, no confusing paperwork.)

r.  Bottom line, *the* "message" communicated by the recitation of that trial court case style is this.  Riviera Beach pled itself right back out of court the instant they *filed* that case, because they were confessing, right up front, in the case style, that Lozman ***hadn't consented*** to being regulated per maritime "transportation" regulations.

s.  Why is that picture included in that opinion's Appendix?

    i.  Who here sees any form of "name" printed anywhere on that floating house?

        (1)  For there to be a name would be for there to be a suggestion of "consent," as if there were a "registration," regardless of any actual "registration."

    ii.  Difficult to see what's not there, unless, of course, there's a witch hunt for "sovereigns."

    iii.  In the *exact* same way that those who put DMV-*approved* tags on their cars are saying, "Kick me!", those who put names on their water-going conveyances are saying, "Kick me!"

    iv.  Since there's "no name" physically on that floating house, it's just all *the more confirmation that Lozman simply never* "consented" to being regulated per maritime "transportation" enforcement authority.

72.  Applying *Lozman* (2013),

    a.  given that "**vehicle**" has an *identical*, disjunctive, two-part verb clause as found in "vessel,"

**"VEHICLE" DEFINED.**

        i.  "**Vehicle**" is a term of legal conclusion. *See* TRANSP. CODE § 502.001(45) (all emphasis added). *See also* TRANSP. CODE §§ 502.001(24), 541.201(23), 621.001(9), and 750.003(a).

        ii.  Edited to its relevant elements for this matter, this is the outline form of the definition of "**vehicle**:"

- a [land-going] device [i.e., car, truck, van, etc.]

- in or by which
  - a person
  - or property
    - » *is* transported
    - » *or may be* transported.

    c.  and given that the content of the definitions is practically identical, where the first verb clause asks about actual "transportation" activity, and the second verb clause is the "coulda, shoulda, woulda" clause,

    d.  it follows that where we have this from *Lozman* (2013),

        No "transportation" + No "consent" = No "vessel,"

    e.  we know this:

        No "transportation" + No "consent" = No "**vehicle**."

**The material facts of June 18, 2017 – The conspiracy begins**

3.     Even with that *20+ page* review of the applicable policy, the material nature

of these facts, which are the *jurisdictional* facts, the facts that control the

*entirety* of the judicial proceedings, will *still* go sailing over the heads of

these parties Respondent.


No "transportation."

4.     For all times relevant to the "transportation" stop, Taylor was not engaged in

"transportation."

    a.     Taylor was not "carrying passengers or cargo."

        i.     There was no one else in the van.

        ii.     There was no passenger manifest.

        iii.     There was no property in the van that someone was paying

            Taylor to "carry" from one place to another.

        iv.     There was no bill of lading.

        v.     There was no hire paid or expected to be paid.

        vi.     Taylor was, in fact, returning to the farm with the groceries

            with the intent of then joining the family for Father's Day.

        vii.     The fact of the *non*-commercial nature of the matter is so

            obvious that no inquiry was even made by either officer into any

            of it, whether passenger(s), cargo, *or* hire.

        viii.     Bottom line, we're talking the classic *non*-commercial situation.

b.  Since all of "carrying," "passenger(s)," and "cargo" are terms of legal conclusion, Taylor prefers the factual element based definition of "transportation." Thus, Taylor was at no time relevant to this stop

    i.  removing people and/or property,

    ii.  from one place to anther,

    iii.  *for hire*,

    iv.  under the choice of law of the "place" called "this state," [3]  or *any* other choice of law, for that matter.

5.  In short, this is a totally *non*-commercial setting.

6.  It seems to escape "official" inquiry, quite readily, in fact, as to how it is that *commercial* regulatory standards are rendered applicable in/to a *non*-commercial setting. It has not escaped *Taylor's* inquiry, and the answer is already presented.

a.  The one and *only* way *commercial* regulatory standards apply in the *non*-commercial context is **by the "target's" consent.**

b.  The one and only way Communist policy applies in *this* country, commercial, non-commercial, any of it, is **by the "target's" consent.**

c.  The one and only way "criminal" sanctions codified *outside* the relevant jurisdiction's penal code apply is **by the "target's" consent.**

---

[3] [←] *See* n.2, *supra.*

<u>No "consent."</u>

**NOT VIA THE VAN ... .**

7.    BREWSTER helped instigate the conspiracy by ***refusing*** to update DMV

records to reflect accurately that DMV's interest in the van had long since

ended.

8.    Prior to the transfer of title to Taylor of the van that CITY seized from

Taylor, Taylor's Mom had terminated the "Certificate of Title" trust that was

in her name. *See* Exs. 12 and 13.

    a.    At that termination, Taylor's Mom reacquired "full title" to that van.

    b.    As of that transfer to Taylor, Taylor acquired "full title" to that van.

    c.    Key is that this van was ***not*** trust *res* to *any* "Certificate of Title" trust

        and hadn't been for months.

**... AND NOT VIA TAYLOR.**

9.    BREWSTER helped instigate the conspiracy by ***refusing*** to update DMV

records to reflect accurately that DMV's interest in Taylor had long since

ended.

10.    The last "Certificate of Title" trust in Taylor's name was the one for his '57

Chevy.

11.    Almost a year prior to the stop, Taylor had terminated that "Certificate of

Title" trust. *See* Exs. 14 and 15.

---

<u>No "transportation" + No consent" = No "**vehicle**."</u>

**"VEHICLE" DEFINED – A REPRISE.**

12.    "**Vehicle**" is a term of legal conclusion. *See* TRANSP. CODE § <u>502</u>.001(45) (all

emphasis added). *See also* TRANSP. CODE §§ 502.001(24), 541.201(23),

621.001(9), and 750.003(a).

13.    Edited to its relevant elements for this matter, this is the outline form of the

definition of "**vehicle**:"

- a [land-going] device [i.e., car, truck, van, etc.]
- in or by which

  ○ a person

  ○ or property

  » *is* transported

  » *or may be* transported.

3.    By mere inspection, we see that "**vehicle**" is *considerably* more than just

another way to say, i.e., a substitute term for, "car," "truck," "van," etc.

a.    A "**vehicle**" is a car/truck/van that is *used for a particular purpose*,

namely, **to "transport" people and/or property**.

b.    A "**vehicle**" is a car/truck/van that is used *for the commercial*

*purpose* of

i.    "carrying passengers or cargo,"

ii.    or, focusing on the factual elements,

---

(1)     removing people and/or property

(2)     from one place to another

(3)     *for hire*

(4)     under the choice of law of the "place" called "this state."

4.      It's this "*or may be* transported" verb clause, the "coulda, shoulda, woulda" verb clause, that is the "pirate speak" that is intentionally worded this way in the very fabric of the legislation, itself, in order to deceive "everyone" for as long as possible in order to hide the fact that Sixth Plank "transportation" policy is 100% commercial nexus dependent, i.e., 100% dependent on the consent of the "target."

**THE FOUR CORE TERMS FOR "TRANSPORTATION."**

5.      Without *evidence* of "**vehicle**," there is no "transportation" claim/charge *to* assert.

a.      There are four core semantical terms, i.e., terms of legal conclusion, for "transportation" enforcement:

i.      "**Operate**," in its various grammatical forms.

"**Operator**" means, as used in reference to a **vehicle**, a person who **drives** or has physical control of a **vehicle**. *See* TEX. TRANSP. CODE ANN. § 541.001(1).  *See also* TRANSP. CODE §§ 601.002(8), 642.001(2), 647.001(5), 724.001(11), and 24.013(f)(2).

ii.   **"Drive,"** in its various grammatical forms.

"**Drive**" means to **operate** or be in physical control of a **motor vehicle**. *See* TRANSP. CODE § **522**.003(11). [4]

iii.   **"Motor vehicle."**

A "**motor vehicle**," per all of its various "definitions," is and means a "**vehicle**" with a motor. *See* TRANSP. CODE §§ 501.002(17), 502.001(25), 522.003(21), 541.201(11), 601.002(5), 642.001(1), 647.001(4), 683.001(4), and 728.001(2).

iv.   And "**vehicle**."

b.   By mere inspection, by those who care to, and who take the few moments it takes to do so, it's self-evidence that all of "**operate**," "**drive**," and "**motor vehicle**" depend, *definitionally and directly*, on "**vehicle**."

c.   This matters, because every single one of the "threatened" "criminal" sanctions defined in the TRANSP. CODE is defined with one or more of these four core terms; hence, the label "four core terms."

d.   Thus, the conclusion already stated: without *evidence* of "**vehicle**," there is no "transportation"-based charge *to* assert.

6.   In short, in the ***non*-commercial** context, where there is, *by definition*, no "transportation" activity going on, the ***only*** possible basis for a "transporta-

---

[4] [←] This is the "commercial driving" chapter. In other words, "**driving**," by its very definition, is ***commercial*** activity.

tion" charge is the consent of the "target."

No Probable Cause.

7. There's a very material difference between a justifiable charge that produces dismissal (or "Not guilty") and a charge that should never have been asserted in the first place.

8. Claims/Charges that lack Probable Cause head the list of those that should never have been asserted in the first place.

9. Claims/Charges STATE can never win, as a matter of law, also head that list.

10. What the "transportation" enforcement personnel are "trained" to "see" as a *violation* happens to be the traveling public's ***best*** way of **giving Notice** of "Do Not Disturb," i.e., of *non*-consent.

   a. This stop happened because Taylor **gave Notice** of his *non*-consent to Sixth Plank "transportation" policy via his display of *non*-DMV-approved taggage.

   b. Since CITY/COUNTY/STATE has effectively destroyed that evidence, it's going to require basic description to establish these facts.

   c. On the front of Taylor's van, he put, in the place where those who are consenting to being regulated per Sixth Plank policy put their DMV-*approved* tags, a brushed stainless steel (basically "silver" in color) plate, the size of a standard *approved* tag, that was just blank/plain.

   d. On the back of Taylor's van, he put, in the place where those who are

consenting to being regulated per Sixth Plank policy put their DMV-*approved* tags, a brushed stainless (basically "silver" in color) plate, the size of a DMV-*approved* tag, that contained the following simple block lettering embossed into that stainless steel plate: CHEVROLET.

e.   There was nothing fancy about Taylor's *non*-DMV-approved taggage.

  i.   The color scheme, basically simple "silver," blended well with the turquoise color of the van.

  ii.   These plates weren't intended to, and didn't, in any way draw any particular attention.

  iii.   They were "clean," in that they were extremely easy to read.

  iv.   The few who mentioned even noticing it thought it was some form of "Dealer" tag.

  v.   They're just basic stainless plates that provide the ***best*** way, not the *only* way, but the **best** way **to give Notice** of *non*-consent.

**Despite those controlling facts and principles, here's what happened**

11.   It helps in understanding how and why this case has developed into what it has to know that it's CITY's policy to prefer and to advance the witch hunt. It's CITY's policy to stigmatize and then to prosecute those stigmatized as "sovereigns," even when they're most self-evidently not "sovereigns," and even where there's zero basis in fact or law to do so. The political indoctrination is preferred over the law. Politics are *so* much easier – no more

thinking required.

12.     It also helps in understanding how and why this case has developed into
        what it has to know that it's GRAYSON COUNTY's policy to prefer and to
        advance the witch hunt.  It's COUNTY's policy to stigmatize and then to
        prosecute those stigmatized as "sovereigns," even when they're most self-
        evidently not "sovereigns," and even where there's zero basis in fact or law to
        do so. The political indoctrination is preferred over the law. Politics are *so*
        much easier – no more thinking required.

13.     It *also* helps in understanding how and why this case has developed into
        what it has to know that it's STATE's policy to prefer and to advance the
        witch hunt.  It's STATE's policy to stigmatize and then to prosecute those
        stigmatized as "sovereigns," even when they're most self-evidently not
        "sovereigns," and even where there's zero basis in fact or law to do so. The
        political indoctrination is preferred over the law.  Politics are *so* much easier
        – no more thinking required.

14.     Try not to miss the irony.  Per WWII, the Nazis couldn't wait to have a
        chance at annihilating all Communists off the face of the planet, and vice
        versa.  But, these days, in UNITED STATES, the Communists have duped,
        seduced, the Nazis to enforce *Communist* policy.

15.     Try not to miss the reality. Texans and Americans still don't put up with the
        Nazis, the Communists, *or* the useful idiots duped by *either* camp.

16.   On Sunday morning, June 18 (2017), Taylor had traveled into town from the (third generation) family farm, [5] *located just south of Howe, to the store* located on Loy Lake just west of Texoma Parkway.  There are double fuel points on the weekends during the summer.

17.   As Taylor made his way back south, SHOOK got the conspiracy started.

18.   SHOOK, acting at all times as a CITY employee and as "transportation" enforcement authority in STATE's name and in CITY's name, stopped Taylor for the alleged want of a DMV-*approved* tag on the rear of the van.

19.   The location of the stop was southbound 75 about Center Street, just north of Exit 58.

20.   As the conversation developed, SHOOK made inquiry about insurance.

    a.   There was none.

    b.   Taylor's rather extensive study into the matter revealed that all policies insure "**vehicles**." "Cars," trucks," "vans," as such, are not insurable.  Thus, it's impossible for Taylor, or any *non*-"**vehicle**" owner, to acquire.

    c.   But, since it's not a "**vehicle**," there's no such requirement, anyway.

21.   CITY instigated and joined the conspiracy by supplying not only the prosecutors for the prosecution against Taylor, in court, of those very same five *criminal* charges, which were just as legally impossible for STATE to

---

[5] [←] The *fourth* generation back settled near Pilot Grove, in which cemetery, managed by Taylor's cousins, is interred Taylor's great-grandparents. The David McAlister Taylor place, as modified (expanded), is still standing *and* occupied.

win in county court as in muni. court, but also the judge, along with "the witch hunt policy" to prosecute those politically stigmatized as "sovereigns," regardless of any political or factual basis for doing so, in order to advance the political indoctrination in favor of, and even, as proved here, instead of the law to which these public officers have sworn oaths of office.

22.   Given that municipal courts are technically STATE courts, STATE instigated and joined the conspiracy by supplying only the agents, acting at all times in STATE's name and on STATE's behalf, but also the initial trial forum, including its judicial officer, along with "the witch hunt policy" to prosecute those politically stigmatized as "sovereigns," regardless of any political or factual basis for doing so, in order to advance the political indoctrination in favor of, and even, as proved here, instead of the law to which these public officers have sworn oaths of office.

23.   SHOOK informed Taylor that "city policy" requires him to order towed all "uninsured vehicles."

24.   Taylor never consented to any such ordinance.

25.   AVILES then joined the conspiracy.

26.   As the conversation developed, Taylor informed AVILES (the Assisting Officer), in the presence of SHOOK (the Ticketing Officer), that their semantics were accurate but that their facts were missing.  Taylor informed them that his van was/is not a "**vehicle**."

27.   AVILES responded with a semantically correct statement about "**motor**

**vehicles**," and Taylor informed them that such semantics are not the way "**vehicle**" is determined.  Taylor opened the discussion involving *Lozman* at or near this time.

28.  Taylor suggested strongly that SHOOK call CITY's Attorney, and that was declined based on its being Sunday morning.

29.  SHOOK called for a tow truck and "requested" that Taylor give him the keys to Taylor's van, which Taylor provided.

30.  The conspiracy escalated to involve illegal seizure of Taylor's van.

31.  Somewhere close to this part of the conversation, and perhaps ahead of it, Taylor informed the officers that towing Taylor's van amounted to theft.

32.  The actual content and sequence of events will be confirmed in either the audio recording made during the stop or the Transcript of such audio recording.

33.  The conspiracy escalated by the initiation of criminal charges against Taylor.

34.  SHOOK issued Taylor a ticket with four TRANSP. CODE charges.

35.  The ticketing system is electronic, rendering "negotiation" of the paperwork impossible. So, Taylor asserted his objections into the microphone so as to make that *viva voce* Record at the time.

36.  Even though SHOOK stopped Taylor for want of a tag, the former tag information is displayed in/on the ticket.

    a.  That information was facially false and misleading.

    b.  One primary source for that false and misleading information is

---

BREWSTER (DMV), who has *refused* to update DMV information when the "Certificate of Title" trusts are terminated.

37.   Taylor was allowed to remove his groceries from his van. The only place to put them was on the shoulder.  Taylor then relocated it all to the feeder road.

38.   Taylor also removed his petty cash fund from the glove box.

39.   One of the officers saw the expired "registration" that had been left in the glove box and asked about it.

40.   Taylor made inquiry as to his being released to make a phone call, and AVILES informed him that he was free to go where he needed.

41.   Taylor crossed the highway in search of a phone.

42.   BOB UTTER TOWING, the DRIVER, and the DRIVER'S ASSISTANT joined the conspiracy by actually taking and carrying away Taylor's van without Taylor's consent.

43.   BOB UTTER TOWING showed up *before* Taylor had located a phone. So, Taylor crossed back over the highway so as to give Notice to the tow truck DRIVER and his ASSISTANT (who he claimed to be his daughter) that they were stealing his van.

44.   DRIVER and his ASSISTANT drove off with Taylor's van on the flatbed.

45.   MIDWAY STORAGE FACILITY then joined the conspiracy.

46.   Some after the seizure of Taylor's van, Taylor's Mom received a Notice in the mail from MIDWAY STORAGE demanding ransom for the return of the van, to her, including a per/day storage cost

    a.    Why was Taylor's Mom involved, at all?

    b.    Because one primary source for the false and misleading information as to who owned that van, and, in particular, in what capacity, is BREWSTER (DMV), who has *refused* to update DMV information when the "Certificate of Title" trusts are terminated.

47.    In September, 2016, Taylor's Mom had terminated the "Certificate of Title" trust. Exs. 12 and 13.

48.    For all times relevant to this matter, Taylor is the one and only owner of his van.  He acquired full title to it from his Mom in exchange for silver at a time after she had terminated the "Certificate of Title" trust.

49.    At no time relevant to this matter did Taylor consent to being regulated per "transportation" standards, including the TRANSP. CODE or any municipal ordinance or policy.

50.    By means of two different documents, both Taylor and his Mom demanded the return of Taylor's van. *See* Exs. 16 to 19.

51.    As of this filing, Taylor's van has still not been returned to him.

52.    In the original suit in equity, Taylor documented his formal report of the theft of his van. *See* Ex. 20.

53.    Taylor has heard nothing further about that report, either.

**Taylor's immediate response was to mitigate damages**

54. From the date of the stop/ticket, Taylor had something like 30 days in which to respond/appear in the muni. court.

55. But, instead of focusing on the defense, Taylor invested the bulk of that time getting together the suit in equity he filed in E.D.Tex.

56. While Taylor did send out a demand letter at that time, his initial response to the seizure of his van was to try to mitigate the damages of all municipal, county, and state officers, agents, and employees who were and would become involved by getting his van back.

57. By Taylor's getting his van back,

    a.   the state officers, including the judges, might be spared this very suit, and

    b.   the *still*-running demand for one million dollars per day for the illegal seizure and subsequent non-return to Taylor of his van would have long since had a stopping point.

58. For the U.S. trial court, the traditional ***bastion*** of the protection of individual rights, including property, to order CITY to return Taylor's van to him, "right now," then

    a.   there'd also be *some* explanation provided as to why, which would tend to "educate" all in the state system, however directly or indirectly, about the reality of the commercial nexus dependency on which "transportation" enforcement actually depends; and

---

b.   there'd also be the greatly increased likelihood that the matter would "end" in the muni. court; i.e., there'd be no further expansion of the conspiracy, e.g., also into the county court.

59.   Boy did Taylor dial a wrong number by mitigating damages in this manner!

60.   To fast-forward through the proceedings so as then to detail them,

a.   E.D.Tex. ultimately dismissed Taylor's suit in equity.

b.   Since E.D.Tex. was so committed to committing Sedition, and intentionally violating Taylor's right to Structural Due Process, Taylor initiated a Judicial Complaint. The alternative is a Probable Cause Affidavit for the U.S. Grand Jury. Trying to get that fixed by "in house" means, e.g., by way of an "intervention" to their addiction to Sedition, seemed the right place to start.

c.   The (then) Chief Justice of USCA5, STEWART, characterized the underlying claim, i.e., the basis for the suit in equity, as "frivolous." And, of course, all the rampant Sedition going on was indirectly blessed to continue. By this manner and means of witness tampering and retaliation, STEWART joined the conspiracy.

d.   Taylor appealed the dismissal out of E.D.Tex., and USCA5 affirmed. There are additional matters about that appeal that are presently under discussion and review, and, therefore, are not detailed further at this time.

e.   Taylor invited S.Ct.U.S. to participate in the decision-making, and

they denied cert.

61.   For detailing this matter, it helps to start at the end so as to understand what "cert. denied" means for *this* fact pattern.

62.   That "cert. denied" ruling means this.

    a.   Taylor's suit in equity was an effort to set "new policy" about how to set "new policy."

    b.   The traditional rule about setting new policy is that it requires an *"at law"* proceeding.

    c.   Taylor's suit was *in equity*.

    d.   Why?

        i.   So as specifically not to *have* to file a suit like this, i.e., for damages, in order that "new policy" be established.

        ii.   **And**, in order to *mitigate* damages. To *mitigate* damages for ***all*** those *not only* already involved *but also* who would foreseeably become involved, given the insanity of the political indoctrination *known* to be disseminated via FBI/SPLC personnel nationwide, which political indoctrination was already self-evidently active in *this* matter against Taylor, CITY was going to have to return Taylor's van to him, "now."

        iii.   The *only* way ***that*** was going to happen was via suit in equity granting the very form of emergency relief Taylor requested.

    e.   So, as far as that "cert. denied" ruling's even materially *reaching* the

---

merits of Taylor's suit in equity, that just simply never happened.
S.Ct.U.S. *characterized* the merits but never *reached* them.

i.    What S.Ct.U.S. recognized, instantly, of course, is that this is a
      *new fact pattern*; hence, *the understood request for new policy.*

ii.   And, since that new fact pattern was showing up in a matter
      sounding in equity, *that* context triggered, from the threshold,
      the policy about setting "new policy."

iii.  Thus, what "cert. denied" *confirms* is that Taylor's fact pattern
      *is* one that *hasn't* already directly been ruled upon. The "cert.
      denied" broadcasts the characterization that the fact pattern in
      Taylor's suit, the "No transportation" + "No consent" = No
      "**vehicle**" fact pattern, *is* new, i.e., one they've never before
      ruled on in an "at law" proceeding.  But, that's as close to
      addressing the merits as this "cert. denied" ruling ever got.

iv.   So, the only *formal* declaration on or about the *merits* from
      S.Ct.U.S. is this: Yes, we've never seen this fact pattern before.

v.    In short, S.Ct.U.S. ***never reached*** the merits.

vi.   Key, since S.Ct.U.S. ***never reached*** the merits, they also never
      even *considered* addressing ***any*** of the collateral issues, ***any*** of
      them. Collateral issues include such things as non-consent to
      magistrate participation and Judicial Complaint proceedings.

      vii.   So, all of the "thinking" that concludes that *all* of the "rulings" and *de facto* decision-making about all the *collateral* issues is "Ok," or "just fine," is here going to be corrected, permanently.

63. With that in mind, let's also look at what that "cert. denied" ruling ***doesn't*** mean.

    a.   It ***doesn't*** mean that there's no Sedition going on.

      i.   That "cert. denied" ruling most certainly ***doesn't*** constitute a "blessing" or encouragement for E.D.Tex. to *continue* in its addiction to committing Sedition, and violating Structural Due Process rights, as chief among the host of crimes and rights violations being committed under color of law and office where there's a "referral," at *any* time, but most especially "at filing," over the objection of *any* of the parties to that litigation.

      ii.   A party's non-consent to magistrate participation is a collateral matter, which isn't address where the merits aren't addressed. Plus, that Judicial Compliant proceeding was collateral to the suit in equity, again, not addressable where the merits aren't addressable.

    b.   It ***doesn't*** mean that a non-consenting *pro se* party may be compelled into arbitration.

    c.   It ***doesn't*** mean that a *non*-assigned § 451 judge may enter *any* order, at all, in a matter, even if it's the Chief Judge, even, or especially, a

referral order, which requires review of the Record.

d.   It *doesn't* mean that § 636(b)(1)(A) has somehow magically been overruled and that it's Ok for E.D.Tex. to refer dispositive matters, at all, much less where the plaintiff appears *pro se*, much less where the party shows up objecting to non-judicial decision-making right out of the chute.

e.   It *doesn't* mean that E.D.Tex. may compel parties to hire attorneys *just in order to have their non-consent "heard" by the court.* That's compelled commerce no matter how it's viewed.

f.   It *doesn't* mean that STEWART was even competent in his assessment of the merits of Taylor's suit in equity by slamming Taylor's basis for seeking equity as "frivolous." S.Ct.U.S., seeing a fact pattern they'd not ruled on before and that the new fact pattern arose in a matter in equity, thus, that Taylor was essentially requesting an extension, modification, or reversal of current law regarding how "new policy" is set, never *reached* the merits of Taylor's suit in equity.

g.   It *doesn't* mean that USCA5 had basis for affirming the dismissal or justification for any other or additional conclusion USCA5 reached.

h.   And, regarding even the merits, themselves, this "cert. denied" ruling in *absolutely no* way, shape, manner, or form comes anywhere *near* meaning, or suggesting, or even remotely implying, that *any* of the state system related officers, agents, and employees had *one shred* of

basis in fact or law to do to Taylor what they did, e.g., steal his van and then prosecute him maliciously to cover the trail of the thieves, i.e., compel Taylor to consent to Sixth Plank "transportation" policy.

i.    (Deliberately skipped.)

j.    That "cert. denied" ruling *doesn't* mean or suggest or intimate *any* of that, at all, whatsoever.

k.    *All* that this "cert. denied" ruling means and communicates is that the policy regarding "setting new policy" is fairly well set in Texas pink granite: Where there's an adequate remedy at law, that's what's got to be pursued in order to set new policy, even where the people *most* in need of guidance are the *judges*.

l.    (Deliberately skipped.)

m.    So, here we are.

64.    STEWART joined the conspiracy "in progress" by criminally tampering with Taylor as a witness.

a.    Taylor is a witness, in both state and U.S. systems, regarding the violations of rights associated with enforcement of Sixth Plank policy against those who aren't consenting to such policies.

b.    Taylor is also a witness, in at least the U.S. system, regarding the manifest criminal conduct associated with compelled consent to magistrate participation (arbitration), which necessarily and instantly

violates the right of access to the § 451 judge, and includes various

forms of Record-tampering; the chief-most crime being Sedition, use of

"force," via court order(s), to overthrow the Judicial Branch.

65.   Taylor had filed a Judicial Complaint regarding the rampant criminal

conduct going on in E.D.Tex., triggered by the illegal "at filing" referral of *pro*

*se* cases, including Taylor's, despite Taylor's overt objection to magistrate

participation, i.e., arbitration, asserted in all caps in the case style on the

front page of every document he filed, exactly as is found on *this* document.

66.   STEWART slammed the merits of Taylor's suit in equity as "frivolous."

Apparently, that would somehow *justify* Sedition.

a.   What was/is Taylor's prior suit in equity "saying?"

    i.   No "transportation" + No "consent" = No "**vehicle**."

    ii.   *Therefore*, ***no state court*** has either subject matter jurisdiction

or personal jurisdiction. *Again see* Exs. 6 and 7.

    iii.   *Therefore*, in order that ***all*** state actors, including the as-of-yet-

named *trial judges*, be mitigated in their damages before this

one gets totally out of hand, CITY needs to return Taylor's van

to him ***immediately*** if not sooner.

b.   Thus, while the Walker County Court has confirmed that on Taylor's

fact pattern, a No "transportation" + No "consent" = No "**vehicle**" fact

pattern, i.e., a no commercial nexus fact pattern, that ***no trial court***

in TEXAS has either subject matter jurisdiction or personal

jurisdiction over TRANSP. CODE based claims, STEWART slammed Taylor's intent to mitigate the damages of those state actors as "frivolous."

67. By slamming Taylor's effort in equity to mitigate damages as "frivolous," on a fact pattern STEWART had never *seen* before, any more than S.Ct.U.S. had ever *seen* it before, STEWART, who has no ignorance of the law defense, generally, and who holds an office for which the law attributes to him full knowledge of the law, intended, via the exercise of the authority of his office, namely Chief Justice, USCA5, to shut Taylor up, i.e., that Taylor be strongly motivated simply withdraw his complaints entirely,  to stop talking about, stop trying to prove, whether with testimony or documents, and stop involving the courts in the resolution about, not only the criminal corruption rampant throughout E.D.Tex. that involves many crimes, chief among them Sedition, but also the criminal corruption rampant throughout the state court system regarding "transportation" enforcement, in particular that there actually *is* a "consent" element at the base of *all* "transportation" enforcement activity.


68. CLARK, MAZZANT, and NOWAK joined the conspiracy "in progress" by committing all kinds of crimes, individually and in conspiracy.  Those crimes are detailed in the Record of Taylor's suit in equity.

69. First thing out of the chute, "at filing," E.D.Tex. ordered Taylor's (*pro se*)

"civil case" "referred" to the designated, but already unconsented-to, magistrate.

    a.    That happened via *"standing order"* signed by CLARK, *as Chief Judge of E.D.Tex.,*

        i.    not as the assigned § 451 judge, but as Chief Judge of E.D.Tex.,

        ii.    via a "standing order," not upon review of the Record, but by a "standing order," before there even was a Record *to* review.

    b.    It just didn't matter that the case style in every document Taylor filed asserted quite plainly his Non-Consent to Arbitration and his Non-Consent to Non-judicial Decision-making, and that in all caps.

    c.    The law just didn't matter.  Either a party files through a "representative," i.e., an attorney, or the case gets "referred."

    d.    This has been E.D.Tex. policy for decades, and Taylor has yet to find even *one* objection, by any member of E.D.Tex., to this compelled consent, compelled commerce policy.

70.    Taylor filed his motion to strike the "referral" "order" and the Local Rule ("standing order") that purport to justify the compelled consent, compelled commerce, effectively Seditious, decades-long standing policy of E.D.Tex.

71.    NOWAK joined the conspiracy, "in progress," by participating, at all.

72.    Despite Taylor's extremely well documented and repeated objection to magistrate participation, NOWAK kept participating, just the same, continuing to file documents into the Record.

73. Taylor kept filing his motions to strike the documents submitted into the Record by NOWAK, the unconsented-to magistrate.

74. Taylor stopped participating in all respects, except for maintaining, actively, his objection to unconsented-to non-judicial decision-making, i.e., arbitration, being conducted illegally by the unconsented-to magistrate.

75. MAZZANT, who served as a magistrate (arbiter) for E.D.Tex. before joining the bench, joined the conspiracy "in progress" by refusing to correct any of the baseless, even illegal, exercises of jurisdiction.

    a. CLARK had zero jurisdiction

        i. to participate, at all; CLARK was not the assigned judge;

        ii. as Chief Judge, to order *any* "referral," by "standing order," of *any* "civil case" filed *any*where in E.D.Tex.;

            (1) Where "administrative appeals" *may **be*** sent to a magistrate, "at filing," even where there's no consent,

            (2) "civil cases" may not, or

        iii. to refer dispositive issues, including matters in equity, at all, period, even if he *were* the assigned judge, or

        iv. to refer ***any***thing over Taylor's objection.

    b. NOWAK had zero jurisdiction to participate,

        i. not only because this was a "civil case" yet the "referral" order came from a judge not assigned to the case;

        ii. not only because "at filing" referrals of "civil cases" defy the duty

to base a "referral" upon review of the Record for *unanimous consent* of ***all parties***;

- (1) Where "administrative appeals" *may **be*** sent to a magistrate, "at filing," even where there's no consent,
- (2) "civil cases" may not, and

   iii.   not only because referral of dispositive issues, including matters in equity, is overtly ***prohibited*** by § 636(b)(1)(A),

   iv.   but also because it was impossible for Taylor to have made his objection and non-consent any more plain and clear.

76.   MAZZANT extended his overt acts toward the conspiracy, "in progress," by *overruling all of Taylor's objections to magistrate participation.*

   a.   MAZZANT's rulings effectively compel consent to magistrate participation, i.e., arbitration.

   b.   MAZZANT's rulings also compel commerce, i.e., compel Taylor to hire an attorney in order to assert his right not to consent to magistrate participation.

77.   Ultimately, Taylor moved for Disqualification/Recusal and transfer to the next closest U.S. trial court not affiliated with E.D.Tex., which is Dallas.

   a.   Taylor pointed out very plainly a great many of the violations of provisions codified in Title 18, U.S.C.A., being committed by the Chief Judge (CLARK), who signed the standing order of "referral," the assigned § 451 judge (MAZZANT), and the unconsented-to-but-

participating-anyway magistrate (NOWAK).

b.   Chief among those criminal acts is Sedition, which, on the civil side, is the intentional violation of Structure Due Process.

78.   Of course, MAZZANT denied those forms of relief, as well.

79.   While all this addiction to Sedition activity was raging forth, given the unabated, unabashed, bold nature of it, along with the host of criminal acts being committed from/by the bench, Taylor initiated a Judicial Complaint process with USCA5.

80.   It was during that process that STEWART characterized Taylor's underlying suit as "frivolous."

a.   Nothing changed about STEWART's perspective, even after Taylor overtly provided copies of the Walker County rulings proving / confirming Taylor's position in the E.D.Tex. suit in equity.

b.   STEWART's flatly, even intentionally, errant characterization amounts

i.   not only to witness tampering and retaliation

ii.   but also as confirmation of his full intent to aid and abet the Sedition, i.e., intentional Structural Due Process violations, along with the host of additional crimes being committed by E.D.Tex.

iii.   as well as confirmation of his full intent to aid and abet the theft (illegal seizure) of Taylor's van.

81.   Ultimately, MAZZANT denied Disqualification, denied Transfer, and dismissed Taylor's suit in equity, as his way of punishing Taylor for Taylor's assertion of his right not to consent to magistrate participation.

    a.   By refusing to withdraw the generic, "standing" "referral" order, CLARK / MAZZANT "froze" Taylor out of the trial court, *see Roell* (consent by conduct),

    b.   and then MAZZANT dismissed, because Taylor wasn't participating, which is the sole way of preserving that non-consent position.

### The municipal court proceedings

82.   SMITH joined the conspiracy, "in progress," by exercising jurisdiction he never had.

83.   SHELBY joined the conspiracy, "in progress," by prosecuting, via various employees within CITY's Attorney's Office, the impossible-for-STATE-to-win charges against Taylor initiated by SHOOK.

84.   SISSNEY and the ASSISTANT MUNICIPAL COURT PROSECUTOR joined the conspiracy, "in progress," by prosecuting the impossible-for-STATE-to-win charges against Taylor in the municipal court.

85.   Here are the four charges SHOOK initiated on the street and that SHELBY, SISSNEY, and ASSISTANT MUNI. COURT PROSECUTOR took to trial:

    a.   No DMV-*approved* tag;

b.    No "registration;"

c.    No insurance; and

d.    No "license."

86.    Despite having invested three of the four weeks (30 days) for his response time to the "tickets" in getting the suit in equity going in E.D.Tex., Taylor still appeared timely in the muni. court via the filing of his Special Appearance and his Plea to the Jurisdiction.

a.    By filing those documents, and thereby "appearing" in muni. court, Taylor fulfilled completely the "agreement" formed via the "ticket" that Taylor appear within that first 30 days.

87.    During the very first meeting, encounter, really, with CITY's Attorney's Office staff, Taylor presented that particular attorney with copies of the Walker County rulings.

a.    Those rulings **prove** not only the validity of the *concept* of Taylor's "no commercial nexus" defense but also of the ***prevailing nature*** of it.

b.    That attorney couldn't unfold himself out from under the table fast enough to get the charges against Taylor set on the trial docket.

88.    SMITH said that he'd read through Taylor's jurisdictional challenges as his diplomatic way of communicating that he thought it was all just _____.

a.    SMITH exhibited from Day One the very sort of perspective Taylor *expected* to find due to the FBI/SPLC political indoctrination programme.

     b.     This is the very sort of situation Taylor had *intended* to obviate via his suit in equity.

89.     SMITH denied Taylor's jurisdictional challenges.

     a.     This is despite the fact that Taylor had tendered to SMITH copies of the Walker County rulings ***proving*** not only the viability of Taylor's defense, in *concept*, but also the ***prevailing nature*** of that defense.

     b.     Into the teeth of those rulings, being far more persuaded by FBI/SPLC political indoctrination than the law or the facts, or even the absolute confirmation that he had zero jurisdiction, via the Walker County rulings, SMITH denied Taylor's jurisdictional challenges and set the matters for jury trial.

90.     MORRIS and FLETCHER joined the conspiracy, "in progress," by adding another frivolous, groundless, harassing, witch hunt, commercial-nexus dependent criminal charge to the list.

91.     MORRIS and FLETCHER charged/sign a charge, the fifth against Taylor, alleging that Taylor was in violation of the agreement to appear.

     a.     One of the first settings came at a time that found Taylor sicker 'an a dog, due to allergies.

     b.     Taylor, upon realizing that issue, contacted the court by phone and obtained a reset.

     c.     Turns out, though, that the clerks had hauled off and charged Taylor criminally, anyway.

d.   This is simply further perpetuation of the very sort of perspective Taylor *expected* to find due to the FBI/SPLC political indoctrination programme.

e.   This is the very sort of situation Taylor had *intended* to obviate via his suit in equity.

f.   Normally, people check the facts before asserting ***criminal*** charges. Here, it was totally sufficient that Taylor had already been stigmatized as a "sovereign," i.e., a "domestic terr*rist." Facts didn't matter as to *why* Taylor wasn't there, namely his being under the direct care of his retired parents in Dallas at the time, who had come to the farm to get him, because they have had a lifetime of experience in dealing with Taylor's allergies and the incapacitating nature of the conditions when the allergies overcome the anti-histamines. *See* Ex. 21. All that mattered for hauling off and charging Taylor with "failure to appear" is that he had been stigmatized, from just a few minutes into the stop, as a "sovereign," and therefore a "terr*rist," by ***politically indoctrinated definition***, and therefore piling on *more* frivolous, groundless, politically-motivated charges was just fine.

g.   How ***dare*** Taylor be Texan enough, American enough, ***and*** lawyer enough to take individual responsibility and refuse to consent to being regulated by Sixth Plank Communist policy!  How ***dare*** he!

h.   How ***dare*** he end up sicker 'an a dog and decline, via physical inability

even to get there, to bring all that to court. How *dare* he! ***Charge*** him!

i.   (Deliberately skipped.)

j.   There being no commercial nexus deriving *from the* TRANSP. CODE, thus, there being no basis from the TRANSP. CODE to conclude any instanter-esque "agreement, all that could *possibly* justify such a "no appearance" charge is the "ticket."

k.   As already mentioned, and for the purposes of making this very point, Taylor had fully satisfied the "agreement to appear" formed in/by the "ticket" by having submitted his Special Appearance and Plea to the Jurisdiction.

l.   (Deliberately skipped.)

m.   The clerks have no ignorance of the law defense, meaning that they knew the charge against Taylor was baseless, but they filed it, anyway.

92.   STATE joined the conspiracy, "in progress," by moving forward against Taylor, in court, with ***criminal*** charges, that were legally impossible for STATE to win.

93.   STATE, via CITY's Attorney's Office, tried Taylor for five, count them, *five*, "transportation"-based charges in the muni. court.

a.   STATE knew or should have known that STATE could never even possibly prevail in any of those matters.

i.   STATE had "no evidence" of "transportation."

ii.   STATE had "no evidence" of "consent."

---

iii.  Thus, STATE had "no evidence" of "**vehicle**," as a matter of law.

iv.  Moreover, Taylor had "broadcast" his *non*-consent via his *non*-DMV-approved taggage, meaning that CITY/SHOOK *never* had Probable Cause even to initiate the stop in the first place.

v.  "The" reason *for* that stop was "the" reason never to have *initiated* it in the first place.

b.  Some more specifically,

i.  **No DMV-*approved* tag** – What is the entire purpose of an approved tag? To broadcast "consent." Thus, Taylor, having terminated the commercial nexus, *can't* display a DMV-*approved* tag without "consenting," any more than Lozman can put a name on his floating house.  *Non*-consenters display either (A) *non*-approved taggage, as Taylor did, or (B) nothing at all, as Lozman does, *either* of which broadcasts "*non*-consent."

ii.  **No "registration"** – Only "**vehicles**" need to be "registered."

iii.  **No insurance** – Not only is insurance required ***solely*** for "**vehicles**," but also insurance ***isn't available*** for *non*-"**vehicles**," such as Taylor's van.

iv.  **No "license"** – Walker County all over again.  Only *fiduciaries* (*to* DMV) need "licenses." Who are *those fiduciaries?*  Those whose names appear on still-active "Certificate of Title" trust documents provided by DMV.

---

v.   **No appearance** – Already addressed. To review this one *again*,
"Appearance" is "by agreement." Taylor appeared (in muni.
court), in July, 2017, as "agreed" (per the ticket), via the filing of
his Special Appearance and his Plea to the Jurisdiction.  Since
Taylor has no commercial nexus arising from the TRANSP. CODE,
there was no instanter-esque "agreement" per the TRANSP.
CODE. The clerk(s) alleged "non-appearance" regarding a date in
Oct., 2017. (Taylor's allergies rendered him sicker 'an a dog.)
Unilateral Notice isn't an "agreement." The Record has no
(because there is no) "agreement" for Oct. There was no "non-
appearance."

94.   During that muni. court trial, Taylor addressed head-on this libelous /
slanderous stigmatization of "sovereignty." SMITH: "Are you *sure* you want
to go there?"

95.   Taylor so successfully cross-examined SHOOK about the definition of
"**vehicle**," which SHOOK didn't know (and neither did either prosecutor, and
neither did SMITH, and neither did either of the clerks, and neither did
anyone else in that courtroom, or in that municipal building, or in the
municipality, etc.), that SMITH at least included the definition in the jury
instructions. Even that, though, was insufficient *for it to "register" with
anyone (other than Taylor) associated with that process that STATE *never*
had evidence to prove "**vehicle**," which wholesale failure of evidence was self-

evident starting before the stop was even commenced.

96.   The advisory panel decided "guilty" on all five charges.

97.   Taylor filed his Bonds, thereby activating the trial *de novo* (appeal) in the *county* court.


**Then came the county court proceedings**

98.   GRAYSON COUNTY formally joined the conspiracy, "in progress," by supplying not only the prosecutors for the next prosecution against Taylor, in court, of those very same five ***criminal*** charges, which were just as legally impossible for STATE to win in county court as in muni. court, but also the county court judge, along with "the witch hunt policy" to prosecute those politically stigmatized as "sovereigns," regardless of any political or factual basis for doing so, in order to advance the political indoctrination in favor of, and even, as proved here, instead of the law to which these public officers have sworn oaths of office.

99.   STATE, via COUNTY's DA's Office, specifically SISSNEY and RALSTON, tried Taylor for the same five, count them, ***five***, "transportation"-based charges as had been tried in the muni. court.

100.   STATE acted through its authorized agent, GRAYSON COUNTY, in particular through the DA's Office, at all times and for all purposes.

   a.   STATE knew or should have known that STATE could never even possibly prevail in any of those matters.

    i.    STATE had "no evidence" of "transportation."

    ii.    STATE had "no evidence" of "consent."

    iii.    Thus, STATE had "no evidence" of **"vehicle,"** as a matter of law.

    iv.    Moreover, Taylor had "broadcast" his *non*-consent via his *non*-DMV-approved taggage, meaning that CITY/SHOOK *never* had Probable Cause even *to initiate the stop in the first place.*

    v.    "The" reason *for* that stop was "the" reason never to have *initiated* it in the first place.

b.    Some more specifically, there being "no evidence" of **"vehicle,"** as a matter of law, and as confirmed by the **two** rulings out of Walker County that there's "no jurisdiction," each of the following matters were impossible for STATE to win, as a matter of law:

    i.    **No DMV-*approved* tag** – What is the entire purpose of an approved tag? To broadcast "consent." Thus, Taylor, having terminated the commercial nexus, *can't* display a DMV-*approved* tag without "consenting," any more than Lozman can put a name on his floating house. *Non*-consenters display either (A) *non*-approved taggage, as Taylor did, or (B) nothing at all, as Lozman does, *either* of which broadcasts *"non*-consent."

    ii.    **No "registration"** – Only "vehicles" need to be "registered."

    iii.    **No insurance** – Not only is insurance required **solely** for "vehicles," but also insurance **isn't available** for *non*-

"**vehicles**," such as Taylor's van.

iv.    **No "license"** – Walker County all over again.  Only *fiduciaries*
(to DMV) need "licenses." Who are those fiduciaries?  Those
whose names appear on still-active "Certificate of Title" trust
documents provided by DMV.

v.    **No appearance** – "Appearance" is "by agreement." Taylor
appeared (in muni. court), in July, 2017, as "agreed" (per the
ticket), via the filing of his Special Appearance and his Plea to
the Jurisdiction.  Since Taylor has no commercial nexus arising
from the TRANSP. CODE, there was no instanter-esque "agree-
ment" per the TRANSP. CODE. The clerk(s) alleged "non-appear-
ance" regarding a date in Oct., 2017. (Taylor's allergies rendered
him sicker 'an a dog.)   Unilateral Notice isn't an "agreement."
The Record has no (because there is no) "agreement" for Oct.
There was no "non-appearance."

101.    This was the phase of the witch-hunt prosecution that allowed Taylor a more
extensive pre-trial challenge.

a.    Taylor filed his Special Appearance and Plea to the Jurisdiction for
each of the five matters.

b.    SIEBMAN set them for hearing.

c.    Just as was the situation with SMITH, SIEBMAN had full Notice of
and access to the Walker County rulings ***proving*** not only the viability

of the *concept* of the "no commercial nexus" defense but also the

***prevailing nature*** of it on this fact pattern, the key fact being

Taylor's *non*-consent.

d.    SIEBMAN denied Taylor's jurisdictional challenges.

    i.    SIEBMAN was a little more reserved in the *expression* of the

        intent to apply "the witch hunt policy," the policy that blinds

        "everyone" it contacts and purports to justify aggressive

        prosecution of "sovereigns," even where there's absolutely

        nothing to prosecute, whether politically *or* factually, than

        SMITH, *but*, just the same, exhibited from Day One the very

        sort of perspective Taylor *expected* to find due to the FBI/SPLC

        political indoctrination programme.

    ii.    That SIEBMAN was exercising jurisdiction she never had is the

        very sort of situation Taylor had *intended* to obviate via his suit

        in equity.

    iii.    That a fellow county court judge had already confirmed Taylor's

        defense, on all four corners, not just in concept but also directly

        on the merits, Exs. 6 and 7,  was of no value to SIEBMAN.

        SIEBMAN knew *better*, and that's that.

e.    Taylor initiated the pre-trial appellate process.

f.    The 5th.CoA (Dallas) said they had no jurisdiction, calling these "civil"

    non-cases "criminal" in nature.

     i.     That's despite the plethora of rulings by S.Ct.Tex. that confirm to anyone who's paying attention that these matters are ***not*** "criminal" in nature but are, rather, "civil" in nature, given the commercial nexus dependency. To "hear" S.Ct.Tex. when they say, "Denied," not DWOJ, but "Denied," is to look for the commercial nexus. S.Ct.Tex., has confirmed *repeatedly, see, e.g.,* Perkins I, Perkins II, Stevens, Taylor V, [6] that "transportation"

---

[6] [←] In *documents in various Records,* Taylor V has been labeled Taylor II. Upon reflection, the decision was made to be a bit more robust in the count. Even still, Taylor's pre-2007 "transportation" matters are not included in the count, and there maybe at least one Collin County matter (settled) also not included. For example, there is the 2004 (?) Corsicana matter, removed to (and remanded back from) USDC, *that pre-dates the Huntsville matter.* Neither Corsicana matter, state court or USDC, is included in the numbering here. Since the relevant focus is on Huntsville, the count starts with that 2007 muni. court matter. Taylor challenged that one to S.Ct.U.S. Collectively, that's all Taylor I. That muni. court judge was back to being part of the Defense Bar early in the pre-trial stage of Taylor II.

Same case, on trial *de novo.* Taylor ran a pre-trial challenge in the state system up to S.Ct.U.S., which 2007 pre-trial effort is here labeled as Taylor II. *That's* the appellate effort during which the trial judge committed fraud on the court against herself that resulted in the 10-year "transfer of venue" delay in that case.

Taylor also filed a suit in USDC against that first judge, et al., which is technically, properly, Taylor III.

Same case, but not the same case. Since the facts changed materially between that initial, 2007 pre-trial challenge and the successful pre-trial challenge of 10 years later, the *2017* pre-trial challenge is here labeled as Taylor IV.

Collectively, the state court proceedings from *this* matter, which include the muni. court proceeding and county court pre-trial, also presented to S.Ct.U.S., is Taylor V. That one went through S.Ct.Tex. first, and the Taylor ruling cited here confirms S.Ct.Tex.'s *civil* jurisdiction over Taylor's pre-trial jurisdictional challenge.

Taylor's suit in equity, *also taken to* S.Ct.U.S., is Taylor VI.

That makes this Malicious Prosecution, etc., suit Taylor VII.

Given the executive / judicial abuses of Taylor, it's not in any way accidental that he's learned what he's learned out of pure self-defense. Given that the "cert. denied" ruling for Taylor VI (the effort in equity) confirms that *S.Ct.U.S.* hasn't seen this

(continued...)

---

matters, at their base, depend on a commercial nexus.

g.  S.Ct.Tex., in *direct* contrast to 5th.CoA (Dallas)'s perspective, and *consistent* with their prior confirmations on this very point, exercised its/their **civil** jurisdiction by Denying Taylor's Petition for Review.

   i.  Taylor was/is still requesting "new policy," and this was an "at law" proceeding," but

   ii.  It was also pre-trial.

   iii.  "New policy" is set by review of "final judgments" in "at law" proceedings.

h.  S.Ct.U.S. also denied cert., and for these same reasons – it's pre-trial.


**Then came the dismissal**

102.  By the time the matters came back to the GRAYSON COUNTY trial court for trial, turns out that SHOOK had moved out of state.

a.  STATE, via GRAYSON COUNTY DA's Office, moved to dismiss for want of key testimony.

b.  Taylor responded promptly, indicating that there's still a very material difference between

   i.  Exercising jurisdiction and dismissing for want of *testimony* and

---

[6] (...continued)
fact pattern before, which may still exist elsewhere and just wasn't appealed, just like Taylor IV, Taylor still may be the first in Texas, and even in our nation (since 1965, when the Money stopped and "funny money" started, i.e., when this current system started), to obtain "no jurisdiction" rulings in a "transportation" matter. [←]

    ii.    Dismissing for want of *jurisdiction*.

  c.    Despite his promptness, turns out that Taylor was already talking up wind and into an empty room – SIEBMAN had already granted STATE's motions.

  d.    To the very end, SIEBMAN exercised jurisdiction she never had, granting *STATE's* motion and dismissing for want of *testimony*.

103.  It would be, though, ten days between the order date (Feb. 18) and the date in the metered postage (Feb. 28) on the envelope containing the dismissals.

**Taylor's Claims**

<u>"Constitutional" challenges.</u>

104.  The TEX. TRANSP. CODE, "as applied," is "unconstitutional."

  a.    Consent cannot be compelled.

105.  The municipal ordinance(s) that SHOOK thought justified stealing Taylor's van, "as applied," is(are) "unconstitutional."

  a.    Consent cannot be compelled.

Malicious Prosecution.

106.  The malicious prosecution is just one more act or series of related acts in furtherance of the conspiracy involving the theft (illegal seizure) of Taylor's van and which proceeded immediately to providing aid to/for those thieves in the escape from and avoidance of prosecution regarding that theft by means that has included persecuting the victim of that theft.

107.  Parties liable for the malicious prosecution and its conspiracy:

a.  STATE OF TEXAS allowed its name to be used as the plaintiff for all the cases pursued against Taylor, in both trial courts.

b.  BREWSTER is an intended beneficiary of the malicious prosecutions.

   i.  BREWSTER is the main fiduciary responsible for the TEXAS DEPARTMENT OF MOTOR VEHICLES (DMV), which is a public charitable trust.

   ii.  BREWSTER is also the one who has *refused* to update DMV's records to reflect accurately the termination of DMV's interest in both the van and Taylor.

   iii.  By that *refusal*, BREWSTER has **fully** *intended* that Taylor be harassed systemically in exactly the way CITY, COUNTY, and STATE have harassed him, including theft of his van and the malicious prosecution(s).

c.  CITY is a conspirator in all of this, having bought into and perpetuated "the witch hunt policy" to prosecute those politically stigmatized as

"sovereigns," regardless of the facts and law in the matter, as proved

by the conduct in perpetuation of that policy of SHOOK, AVILES,

SHELBY, FLORES, BOB UTTER TOWING, DRIVER, DRIVER'S

ASSISTANT, MIDWAY STORAGE FACILITY, SISSNEY, the

ASSISTANT MUNI. COURT PROSECUTOR, SMITH, MORRIS, and

FLETCHER.

d.   SHOOK filed the four "transportation"-based charges.

e.   AVILES assisted SHOOK in the illegal seizure of Taylor's van.

f.   MORRIS and FLETCHER joined up to initiate that fifth charge, which

is the "failure to appear" charge.

g.   SISSNEY, then an employee of CITY's Attorney's Office, prosecuted

the five charges in muni. court, along with the MUNI. COURT ASST.

PROSECUTOR, which cases could *never* be won by STATE, as a

matter of law.

h.   SMITH,

i.   despite having two oaths of office, once for the "license" and one

for the judicial office, and

ii.   despite having reviewed both Taylor's Special Appearance and

his Plea to the Jurisdiction, and

iii.   despite having reviewed both Walker County rulings confirming

not only the *concept* of Taylor's defense but also the **prevailing**

**nature** of it on these facts,

---

      iv.    proceeded to exercise jurisdiction he never had,

      v.    in full support and with full intent to support CITY's, COUNTY's, STATE's "witch hunt policy," persecuting all those politically stigmatized as "sovereigns," regardless of whether they are or not, regardless of what the facts are, and in defiance of what the applicable law is.

i.    (Deliberately skipped.)

j.    GRAYSON COUNTY is a conspirator in all of this, having bought into and perpetuated "the witch hunt policy" to prosecute those politically stigmatized as "sovereigns," regardless of the facts and law in the matter, *as proved by the conduct of* SIEBMAN *and the DA's Office,* namely SISSNEY and RALSTON.

k.    SIEBMAN

      i.    despite having two oaths of office, once for the "license" and one for the judicial office, and

      ii.    despite having reviewed, by full hearing, both Taylor's Special Appearance and his Plea to the Jurisdiction, and

      iii.    despite having reviewed both Walker County rulings confirming not only the *concept* of Taylor's defense but also the **prevailing nature** of it on these *facts,*

      iv.    proceeded to exercise jurisdiction she never had,

      v.    in full support and with full intent to support CITY's,

COUNTY's, STATE's "witch hunt policy," persecuting all those politically stigmatized as "sovereigns," regardless of whether they are *or not, regardless of what the facts are, and in defiance of what the applicable law is.*

vi.   SIEBMAN also twice ***refused*** to keep the demand letters served on her, sending both of them back to *Taylor.*

l.   (Deliberately skipped.)

m.   SISSNEY and RALSTON prosecuted the five cases in the county court, which cases STATE could *never* win, as a matter of law.

n.   BOB UTTER TOWING took physical possession of Taylor's van, via the direct actions of DRIVER and DRIVER'S ASSISTANT.

o.   (Deliberately skipped.)

p.   Proving the continuing corruption of DMV's records, which records BREWSTER ***refuses*** to make correct, MIDWAY STORAGE facility demanded a ransom for the return of Taylor's van from *Taylor's Mom.* Both demanded that the van be returned to Taylor.  Upon Taylor's refusal to pay that ransom, and in defiance of Taylor's demand that his stolen van be returned immediately to him, MIDWAY STORAGE has apparently sold Taylor's stolen van into interstate commerce.

q.   FLORES, as Police Chief, has aided the conspiracy by not obtaining competent training for his officers.

r.   SHELBY, as CITY ATTORNEY, has aided the conspiracy by

      i.     supplying prosecutors for the muni. court prosecution,

      ii.    helping form and support CITY's implementation of the "witch hunt policy,"

     iii.   and failing to train CITY's "transportation" enforcement personnel into the reality of "transportation" enforcement, preferring, instead to support "the witch hunt policy" and persecuting those politically stigmatized as "sovereigns," regardless of the facts and regardless of the law.

s.    STATE is a conspirator in all of this, having bought into and perpetuated "the witch hunt policy" to prosecute those politically stigmatized as "sovereigns," regardless of the facts and law in the matter, as proved by the conduct of CITY, SHOOK, AVILES, SHELBY, FLORES, BOB UTTER TOWING, DRIVER, DRIVER'S ASSISTANT, MIDWAY STORAGE FACILITY, SISSNEY, the ASSISTANT MUNI. COURT PROSECUTOR, SMITH, MORRIS, FLETCHER, GRAYSON COUNTY, SIEBMAN, SISSNEY (again), RALSTON, and BREWSTER, all of whom/which have acted as authorized agents for STATE throughout this conspiracy and ordeal.

t.    CLARK, MAZZANT, and NOWAK joined the conspiracy, generally, thus have contributed toward the malicious prosecution conspiracy, by committing numerous crimes against the laws of UNITED STATES, targeting Taylor, including Record tampering, witness tampering and

Sedition, which latter one, on the civil side, is the intentional violation of the right to Structural Due Process.

u.  STEWART joined the conspiracy, generally, thus has contributed toward the malicious prosecution conspiracy, by witness tampering Taylor, characterizing as "frivolous" the merits of Taylor's suit in equity in E.D.Tex., which Taylor filed, with the intent to mitigate the damages of the state actors, within that first 30 days after that four-charge "ticket" was issued to Taylor.

   i.  By so characterizing Taylor's suit, STEWART, intended to shut Taylor up, intending to intimidate Taylor to withhold evidence not only about the commercial nature of the Sixth Plank "transportation" enforcement mechanism but also the rampant Sedition going on throughout E.D.Tex.,

   ii. thereby not-so-subtly *encouraging* **both**

      (1)  the whole of the criminal conduct and rights violations engaged by the state actors as well as

      (2)  the whole of the criminal conduct and rights violations engaged by the U.S. court system actors.

108.  In STATE's name, both CITY *and* COUNTY, individually and independently, through their officers, agents, and/or employees, commenced *five* cases / charges against Taylor.

a.   Muni. Court Nos.

    i.      1700002951

    ii.     1700002952

    iii.    1700002953

    iv.     1700002954

    v.      1700004472

b.   County Court Nos.

    i.      2018-2-0223

    ii.     2018-2-0224

    iii.    2018-2-0225

    iv.     2018-2-0226

    v.      2018-2-0227

109.  Regarding each of those matters,

a.   There was never Probable Cause;

b.   It was impossible for STATE to prevail, as a matter of law;

c.   Taylor was innocent, as a matter of law; and

d.   The dismissals are rulings in Taylor's favor.


110.  As addressed, *supra*, there was never any Probable Cause.

**NO "TRANSPORTATION."**

a.   The very context was a *non*-commercial setting. There was never even

the *remotest* of thoughts that Taylor was at any time "carrying

passengers or cargo," i.e., (1) removing people and/or property (2) from one place to another (3) *for hire* (4) under the choice of law of the "place" called "this state."

NO "CONSENT."

b.    Taylor had given full, *clear*, and *complete* Notice of his *non*-consent by means of displaying *non*-DMV-approved taggage.

    i.    Taylor's van was at no relevant time a "**vehicle.**" There was no active "Certificate of Title" trust regarding the van.

    ii.   Taylor was at no relative time a fiduciary to DMV. There was no active "Certificate of Title" trust in Taylor's name.

c.    SHOOK fully received that Notice, given that "the" reason for the stop *was* the *non*-DMV-approved taggage.

THUS, NO "VEHICLE."

d.    As a matter of law, then, there's not one single "transportation"-based charge that was ever justified, since every single one of them depends directly and specifically on there being a "**vehicle.**"

111.   As regards the fifth charge, "failure to appear," *jurisdictionally*, there was never any "agreement" regarding the Oct. 2017 "appearance."

---

112.   Harboring malice.

  a.    The harboring of malice is exactly what has blinded these parties
        Respondent to everything Taylor has been telling them from the
        moment this got started.

  b.    Every single one of these parties has been pursuing "the witch hunt."
        That witch hunt started the instant that SHOOK concluded, from his
        political indoctrinations which substituted for competent training, that
        Taylor was a "sovereign," thus, by definition, a "domestic terr*rist."

  c.    Every single one of these parties Respondent has seen the ruling<u>S</u> in
        Taylor's favor from the Walker County matter, and every single one of
        these parties perpetuated and/or supported the perpetuation of the
        prosecution against Taylor, *anyway*, intending to shove a red hot
        pokers up his ass, because, "obviously," and "by (*politically
        indoctrinated*) definition," Taylor was a "sovereign," i.e., a "domestic
        terr*rist."

113.   Regarding damages.

  a.    In addition to the fact that a violation of rights is, by that violation,
        damaging conduct, there are also the following facts.

  b.    Each and every single one of the parties Respondent has participated
        in the protection and harboring of those who stole Taylor's van, with
        the intent that those who took Taylor's van and carried it away escape
        prosecution.

c.   Each and every single one of the parties Respondent is a conspirator in the theft of Taylor's van.

    i.   It was an illegal seizure, and

    ii.   no one in a position to remedy that lifted a finger in preventing or curing that theft.

d.   Instead, each and every single one of these parties Respondent actively pursued, or supported the pursuit, of the "criminal" cases filed and prosecuted against Taylor, despite the fact that not one of them could ever be won.

e.   The car theft event totally ruined that Father's Day, for the entire family who had gathered in Dallas.  In fact, it was Taylor's Dad and Taylor's elder nephew who came to Sherman to get Taylor off the side of the feeder road.

f.   Taylor was then compelled to try to maintain a farm property, where he's responsible for that property, as improved, and for the live animals, and even to "just exist," at all, in rural Texas, *without* a car. That raised a material level of stress and concern.

g.   Taylor was rendered unable to keep up with his elderly parents in Dallas and maintain the family traditions.

    i.   Due to the theft of Taylor's van, along with the facilitation of the escape from the scene and from prosecution, along with the conspiring with those actors and/or aiding and abetting that

illegal seizure, Taylor's Mom and Dad, in order to maintain the family traditions (Sunday lunch), and to provide Taylor a way to get to the store, had to make *two* round trips, where Taylor had been making just one.

ii. These parties Respondent put Taylor's Mom and Dad on the road for ***twice*** as long per trip as Taylor would have been.

iii. That raised a ***very*** high level of stress and concern, and it was often very distracting to Taylor as he tried to get his (other) work done.

iv. It's a very helpless, no-control feeling.

h. Taylor was totally rendered unable to handle emergencies,

i. not for any of the animals, and

ii. not even for himself.

iii. That raised a ***very*** high level of stress and concern that permeated every moment of every day.

i. (Deliberately skipped).

j. In the stealing of Taylor's van, there's the associated intentional violations of rights, as well, including, for example, the right to be free from unreasonable seizure and the right not to contract / agree / consent to being regulated for "transportation" purposes. Thus, there's the basic sense of total invasion of personal "space" that anyone victimized by such criminal conduct experiences.

k.     Because Taylor's van was the sole means of travel for Taylor that
       accommodated his commitment of not consenting to Sixth Plank
       "transportation" regulatory authority, especially as regards his non-
       commercial travel activity, by stealing Taylor's van, these parties
       Respondent caused a very high level of stress and concern for the
       *additional reason that even in helping Mom and Dad with their dual
       round-trip travel, Taylor was basically turned into a "law"-violator.*

l.     (Deliberately skipped.)

m.     Then, once Taylor's Mom was released from the hospital for home
       hospice (kidney failure, due to what was diagnosed as a form of bone
       cancer), Taylor's Sister (and Brother-in-law) lent Taylor their
       Suburban.  It happens that they still consent to Sixth Plank regulatory
       authority. *I.e.*, that conveyance *is* a **"vehicle."**  It's still "in the system."
       Thus, because Taylor will not ever be forced to "consent" to being
       regulated under Sixth Plank Communist policy, about anything,
       Taylor still does not have, and will not ever be obtaining, a "license."

n.     Thus, these parties Respondent have forced Taylor into this
       "necessary" circumstance of traveling in a **"vehicle"** without a
       "license."

o.     *(Deliberately skipped.)*

p.     Every day and every day and every day, that's a source of extremely
       high stress and concern, because there simply are no more cars to go

around.  Should *any*thing happen, then that car would get "towed," and Taylor would be, *once, again, on the farm* (presuming Taylor could get back to it) without a way to travel. Very, very high stress and concern from this circumstance.

q.   There's also the angle on the false charge of non-appearance that suggests manifest irresponsibility, which is another rather difficult injury to reputation *to* overcome.

r.   And, as may also speak for itself, there are the additional social and political consequences from being stigmatized as a "sovereign," thus as a "domestic terr*rist." That's a rather difficult injury to reputation to overcome, *especially* since it's the "officials" who are doing the political stigmatizing.

114.   Actual damages: Thus, for the malicious prosecution claim(s), Taylor demands one million dollars per case as actual damages.  That's a total of five million dollars ($5,000,000) in actual damages, jointly and severally.

115.   Punitive damages: Because all of this was lawless from the start, political from the start, egregious from the start, intentional from the start, without one ***shred*** of justification for libeling/slandering Taylor as a "domestic terrorist," via the route of stigmatizing Taylor as a "sovereign citizen," by falsely and maliciously prosecuting Taylor instead of those who were actually committing felony-level crimes, by means of the illegal seizure, i.e., the theft,

of Taylor's van, Taylor demands one million dollars per case for punitive damages, thus five million dollars ($5,000,000), as well, jointly and severally.

Destruction of evidence; Conversion – Taylor's taggage.

116.   Parties liable. *See* the list of conspirators in the Malicious Prosecution claim.

117.   Liability is joint and several.

118.   This a conspiracy claim.

119.   The taggage Taylor used on the van was exculpatory evidence that was never produced in Discovery or for trial.

120.   In the muni. court, SHOOK was basically "excused" from the failure to produce the *taggage* per the Subpoena Duces Tecum served on him.

121.   Taylor demanded return of those tags in his demand letter, but they were not returned.

122.   Those tags cost $40 each, thus $80 total.

123.   The parties Respondent, by means of their collective conspiracy targeting Taylor, have taken possession, custody, and control of those tags, without basis in law or fact, and have either destroyed them or otherwise handled them with the intent of depriving Taylor permanently of them.

Conversion of Taylor's van.

124.   In his demand letter, Taylor demanded return of his van, the keys, and all the contents.

---

125. Nothing was returned.

126. Parties liable. *See* the list of conspirators in the Malicious Prosecution claim.

127. Liability is joint and several.

128. This is a conspiracy claim.

129. Taylor was both the owner and the one in possession at the time the conspirators took it.

130. In furtherance of the conspiracy, the parties Respondent, acting intentionally in concert, league, and conspiracy, in particular with and through BOB UTTER TOWING, DRIVER, and DRIVER'S ASSISTANT, took possession, custody, and control of Taylor's van without one shred of basis in fact or law, unlawfully and without authorization.

131. Their assertion of possession, custody, and control assumed and exercised control over Taylor's van to the exclusion of, or inconsistent with, Taylor's rights as the owner.

132. MIDWAY STORAGE demanded ransom for its return, and was, for at time in there, exercising continuing control over Taylor's van, unlawfully, without authorization or consent, to the exclusion of, or inconsistent with, Taylor's rights as the owner.

    a.    BOB UTTER FORD's possession, and MIDWAY STORAGE's possession was unlawful, because there's nothing about "transportation" enforcement that ever applied, as detailed, *supra*.

    b.    Their possession to the exclusion of Taylor's interests was

unauthorized, because Taylor never consented, as demonstrated at the time by Taylor's asserting that taking his van constituted theft of it, as communicated to both officers and both people associated with the tow truck.

    c.    Clearly, by towing Taylor's van, they exercised control over Taylor's van to Taylor's exclusion and inconsistently with Taylor's rights as the owner.

    d.    Just as clearly, by demanding "ransom" for it's return, MIDWAY STORAGE, at least for a time, exercised control over Taylor's van to Taylor's exclusion and inconsistently with Taylor's rights as the owner.

133. The estimated value of the van at the time of the acts of conversion was $2,483.

134. However, there's an added market value to some, who, like Taylor, have no interest in having a means of travel that's "in the system."

135. For this reason, Taylor asserts that actual market value of that van at the time it was converted was $5,000.

136. Additional damages associated with this conversion are those costs to Mom and Dad for their travel to/from the farm, and for the costs of using their van for travel to/from Virginia Beach for their granddaughter's, Taylor's niece's, wedding.

137. At the time of the demand letter, that cost was estimated to be $5,000.

138. Taylor has also incurred expenses in the use and regular maintenance of the

Suburban on loan to him.

139. At the time of the demand letter, that cost was $2,500.

140. Since that time, there have been additional costs for tires and repairs.

141. Actual damages demanded: $7,500, plus the additional costs.

142. Punitive damages demanded: $7,500, plus the amount of the additional costs.

### Fraud.

143. Parties liable. *See* the list of conspirators in the Malicious Prosecution claim.

144. Liability is joint and several.

145. This is a conspiracy claim.

146. In furtherance of the conspiracy, the parties Respondent, acting intentionally in concert, league, and conspiracy, in particular with and through BOB UTTER TOWING, DRIVER, and DRIVER'S ASSISTANT, took possession, custody, and control of Taylor's van under false pretenses and then demanded "ransom" for its return. *See* the details in the Conversion claim.

147. Taylor was both the owner and the one in possession at the time the conspirators took it.

148. Taylor's van hadn't been subject to "transportation" enforcement authority since Sept., 2016, and yet Taylor had to defend himself against "transportation"-dependent charges.

149. The conspirators, in particular CITY, COUNTY, STATE, and BREWSTER (DMV), intended, by means that include BREWSTER's maintenance of false

---

and fraudulent DMV records, *to obtain property from Taylor under the disguise of "fines," along with the van, as the consequence of the prosecution of "crimes" that were/are impossible to prove, should never have been charged in the first place, and should have been dismissed for want of jurisdiction rather than tried or dismissed for want of testimony/evidence.*

150. As a part of this fraud scheme, MIDWAY STORAGE sent is ransom demands through the mail.

151. Given the actual market value in Taylor's estimation of $5,000, plus the related costs, including reasonable wear and tear, on Mom and Dad's van for all use required of it during the time Taylor's van has been unavailable.  That includes several round trips from/to Dallas, and the round trip to Virginia Beach to attend Taylor's niece's (Mom and Dad's granddaughter's) wedding, which costs are estimated to be $5,000.

152. Actual damages: $10,000, joint and several.

153. Punitive damages.  Since we're taking fraud, and intentional conduct, that is wanton, or callously indifferent, or deliberately indifferent, to the facts and law relevant to this matter, Taylor demands twenty-five thousand dollars ($25,000) in punitive damages for Fraud, joint and several.

Violation of right to be free from unreasonable seizure.

154. Parties liable. *See* the list of conspirators in the Malicious Prosecution claim.

155. Liability is joint and several.

156. This violation of rights claim is a conspiracy claim.

157. Per 42 U.S.C. § 1983, and *Bivens*, each party Respondent, whether an individual or a commercial entity, *is* a "person."

158. Also, so are the "governmental entitles" when a "person" would be liable, with the additional understanding that "governmental entities" have a few more defenses than an individual would have, but not where the "governmental entity" is engaging in commercial activity.

159. Each conspirator has acted under color of any statute, ordinance, regulation, custom, or usage of any State, Territory, or the District of Columbia, including those of CITY's, GRAYSON's, STATE's, and UNITED STATES's.

160. By so acting under color of law, each conspirator has subjected or has conspired to subject Taylor, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, namely the fundamental right to be free from unreasonable seizure.

161. That which was seized is Taylor's van.

162. Seizure of property is any act that constitutes or results in some meaningful interference with the exercise of possessory interests in the property.

163. It's an unreasonable seizure.

    a.    It was seized under the claim that there needed to be insurance coverage and that CITY policy required the towing of uninsured "(motor) **vehicles**."

    b.    But Taylor's van was not "**vehicle**," thus, was also not a "**motor vehicle**."

    c.    Therefore, there was no commercial nexus for Taylor to breach, much less for anyone purporting to enforce "transportation"-based claims to enforce.

    d.    Taylor never had any obligation to prove that insurance coverage for his van existed.

164. CITY set the policy.

165. CITY's attorney, SHELBY, advocated enforcement of the policy and taught, or had others teach, CITY's "transportation" enforcement personnel to enforce that municipal policy.

166. SHOOK called for the tow, even though there was no "**vehicle**" at issue.

167. AVILES was never heard to object to that decision.

168. BOB UTTER TOWING, DRIVER, and DRIVER'S ASSISTANT all participated in the physical taking and carrying away of Taylor's van.

169. MIDWAY STORAGE exercised possession, custody, and control over Taylor's van while demanding "ransom" for its return.

170. BREWSTER *refused* to update DMV's records so as to confirm removal of

this van from DMV's property inventory rolls, *so as to Notify any and all law enforcement officials that this van isn't subject to the* TRANSP. CODE.

171.   Actual damages: one million dollars ($1,000,000) per day, or any part thereof, that Taylor has been without his van, starting as of June 18, 20**17**, when the conspirators first took Taylor's van.

172.   This is a *continuing damages claim which increases at* 12:01 a.m. local time (in Sherman, Texas) every day until Taylor is restored to full possession of his van (with the keys, and the contents of Taylor's van still in the van at the time it was seized).

173.   Punitive damages. Given the intentional, wanton, completely lawless conduct involved, are the same: $1,000,000 per day, starting June 18, 20**17**.


<u>Violation of right not to contract / agree / consent.</u>

174.   Parties liable. *See* the list of conspirators in the Malicious Prosecution claim.

175.   Liability is joint and several.

176.   This rights violation claim is a conspiracy claim.

177.   Per 42 U.S.C. § 1983, and *Bivens*, each party Respondent, whether an individual or a commercial entity, is a "person."

178.   Also, so are the "governmental entitles" when a "person" would be liable, with the additional understanding that "governmental entities" have a few more defenses than an individual would have, but not where the "governmental

entity" is engaging in commercial activity.

179.   Each conspirator as acted under color of any statute, ordinance, regulation,
       custom, or usage of any State, Territory, or the District of Columbia,
       including those of CITY's, GRAYSON's, STATE's, and UNITED STATES's.

180.   By so acting under color of law, each conspirator has subjected or has
       conspired to subject Taylor, any citizen of the United States or other person
       within the jurisdiction thereof to the deprivation of any rights, privileges, or
       immunities, secured by the Constitution and laws, namely the fundamental
       right not to contract / agree / consent.

181.   Which agreement are we taking about?

       a.   The agreement sounding in trust by which one consents to being
            regulated per Sixth Plank "transportation" authority.

       b.   The agreement evidenced by the "Certificate of Title" trust.

182.   Taylor has gone to considerable trouble and effort to exercise his right to
       terminate that trust agreement so as to own and use a car that is free from
       "commercial" regulations for non-commercial activity.

183.   Having terminated that clandestine trust agreement, Taylor has

       a.   had his van seized illegally (stolen), and

       b.   been charged with five totally bogus charges.

184.   Each party Respondent took steps toward the accomplishment of the
       conspiracy, either directly toward taking the van, or indirectly toward
       supporting the taking of the van and the prosecution of the "criminal

---

charges" against Taylor, as stated in the Malicious Prosecution claim.

185. Actual damages: one million dollars per "criminal" charge, thus five million

dollars, plus one million dollars for stealing Taylor's van, all of which are acts

under color of law and office that arise in direct response to Taylor's having

exercised hiss right not to contract / agree / consent.  The total is six million

dollars ($6,000,000).

186. Punitive damages.  It's the same amount for the punitive damages, arising

from the intentional, wanton, lawless nature of the commission of the rights

violation against Taylor, thus six million dollars ($6,000,000).


Violation of right not to exercise a privilege.

187. Parties liable.  *See* the list of conspirators in the Malicious Prosecution claim.

188. Liability is joint and several.

189. This rights violation claim is a conspiracy claim.

190. Per 42 U.S.C. § 1983, and *Bivens*, each party Respondent, whether an

individual or a commercial entity, is a "person."

191. Also, so are the "governmental entitles" when a "person" would be liable, with

*the additional understanding that "governmental entities" have a few more*

*defenses than an individual would have, but not where the "governmental*

*entity" is engaging in commercial activity.*

192. Each conspirator has acted under color of any statute, ordinance, regulation,

custom, or usage of any State, Territory, or the District of Columbia,

including those of CITY's, GRAYSON's, STATE's, and UNITED STATES's.

193.    By so acting under color of law, each conspirator has subjected or has

conspired to subject Taylor, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities, secured by the Constitution and laws, namely the fundamental

right not to exercise a privilege.

194.    Which privilege are we taking about?

    a.    It's called "driving."

195.    Taylor can no more be compelled to "drive" than to incorporate.

196.    Since Taylor doesn't want to "drive," Taylor has the same right everyone has

not to exercise the privilege of "driving," and Taylor has exercised *the right*

*not* to exercise that privilege.

197.    Not only may "government" not compel someone into a fiduciary role or office

but also "government" may not compel anyone to exercise a privilege.

198.    In response to Taylor's exercise of his *right not to exercise a privilege,* the

conspirators

    a.    illegally seized (stolen) his van, and

    b.    initiated four (of the five) criminal charges against him.

199.    *Actual damages: one million dollars per associated "criminal" charge,* thus

*four million dollars,* plus *one million dollars for stealing Taylor's van,* all of

which are acts under color of law and office that deprive Taylor of or to

---

harass Taylor for exercising his right *not to exercise the privilege called* "driving."   The total is five million dollars ($5,000,000).

200.   Punitive damages: Given the intentional, wanton, completely lawless conduct involved, they are the same, namely five million dollars ($5,000,000).

Failure to train / supervise – violation of right to be free from unreasonable seizure.

201.   For these next claims, which are the "Failure to train" claims, the focus is on CITY's Attorney's Office, in particular SHELBY.

202.   Clearly, CITY has failed to train it's "transportation" enforcement personnel. Thus, some more specifically, CITY's Attorney, SHELBY, has failed to train CITY's "transportation" enforcement personnel.

203.   "Everyone" knows that there's a right to be free from unreasonable seizure.

204.   This right is clearly established.

205.   Law enforcement personnel are expected to know the law, and yet they are also expected to be trained competently into the various areas of law relevant *to the areas of expected enforcement.*

206.   By seizing Taylor's van, for alleged violations of the TRANSP. CODE, and for alleged violations of a municipal ordinance, neither of which ever applied to Taylor or to that set of facts and circumstances, Taylor's right to be free from unreasonable seizure was violated.

207. "Transportation"-based tickets are issued in usual and recurring circumstances.

208. Seizures of "vehicles" for want of insurance, happens in usual and recurring circumstances, as well.

209. Regarding inadequate training or inadequate supervision, either each law enforcement officer is trained to understand the difference between "travel" (no consent to being regulated) and "transportation" (consent to being regulated) or s/he isn't.  If each officer doesn't understand that difference, then there's at least a training problem.  Where this difference doesn't matter, as a general policy, then we're talking deliberate indifference, meaning that there's also a supervision problem, or else a problem with training the supervisor.

210. Deliberate indifference is the cause of the inadequate training.

211. SHELBY knew or should have known that "transportation" enforcement depends on "consent," especially in the non-commercial context, for it's a matter of the job of each to know, and ignorance of the law is no excuse or justification. Even the Tex. Penal Code distinguishes "transportation" and "travel." See § 46.02 (unlawful[ly] carrying weapons) and 46.15(b) (§ 46.02 "does not apply" where the person "is traveling").

212. Yet, despite the fact Taylor was not "consenting" to being regulated, Taylor got charged criminally and Taylor's van stolen by a law enforcement officer within SHELBY's scope of duty to train.

---

213. Instead of teaching the actual workings of the "transportation" system to the "transportation" enforcement personnel, the actual mechanics of that system are kept away from the enforcement officers, and that is very intentional.

214. It's the lack of training that causes the rights violations.  Law enforcement officers are not attorneys.  They depend on training to understand the duties and limits of their office.  Since a reasonable and prudent officer would in no way charge criminally a party against whom there's facially no evidence, it follows that the training fails to inform the law enforcement officers not only of the difference between "travel" and "transportation" but also of the consequences for asserting factless criminal charges.

215. If the training were complete, each law enforcement officer would be very well aware that intimidation or harassment of someone for his/her assertion of a right, including the right not to contract, is a federal offence. *See* 18 U.S.C. § 242.  Each officer would also be very well aware that where two or more people are involved in such activity, that what's being committed against that party not engaging in "transportation" is a conspiracy to violate rights that is punishable by up to 10 years in the federal lock-up. *See* 18 U.S.C. § 241.

216. Actual damages: For actual damages for failure to train regarding the right to be free from unreasonable seizure, Taylor demands one million dollars ($1,000,000).

217. Punitive damages: Given that the failure to train is intentional and/or

deliberately indifferent, Taylor also demands one million dollars ($1,000,000) in punitive damages.

Failure to train / supervise – violation of right not to contract / agree / consent.

218.   Clearly, CITY has failed to train it's "transportation" enforcement personnel. Thus, some more specifically, CITY's Attorney, SHELBY, has failed to train CITY's "transportation" enforcement personnel.

219.   But, for this one, it's not just the police who have not been trained.  It's also the muni. court staff who feel the need to haul off and charge people who are physically unable to attend court due to physical illness.

220.   Some might put this duty at the feet of the judge, but judges are specifically prohibited from "practicing law," which includes counseling on matters as to what the law is and/or isn't.

221.   In other words, the duty to train still falls upon the attorney.

222.   "Everyone" knows that there's a right not to contract / agree / consent.

223.   This right is clearly established.

224.   Law enforcement personnel and court staff, including the clerks, are expected to know the law, and yet they are also expected to be trained competently into the various areas of law relevant to the areas of expected application.

225.   By being charged "criminally" five times, all of which depend on some form or

another of "consent," Taylor's right not to contract / agree / consent was violated.

226. "Transportation"-based tickets are issued in usual and recurring circumstances.

227. "Failure to appear" tickets/charges are issue in usual and recurring circumstances.

228. Regarding inadequate training or inadequate supervision, either each party who acts under color of law and office knows what s/he is talking about or s/he doesn't. Here, not one of them did. Not one. Where these non-attorneys don't understand the laws they're hauling off and charging people with *criminal* charges as violating, then there's at least a training problem. Where this difference doesn't matter, as a general policy, then we're talking deliberate indifference, meaning that there's *also* a supervision problem, or else a problem with training the supervisor.

229. Deliberate indifference is the cause of the inadequate training.

230. SHELBY knew or should have known that "transportation" enforcement *depends on* "consent," especially in the *non*-commercial context, for it's a matter of the job of each *to* know, and ignorance of the law is no excuse or justification. Even the Tex. Penal Code distinguishes "transportation" and "travel." *See* § 46.02 (unlawful[ly] carrying weapons) and 46.15(b) (§ 46.02 "does not apply" where the person "is traveling").

231. SHELBY knew or should have known that "non-appearance" in "transporta-

---

tion" matters is another consent-dependent matter and that unilateral Notice

of a setting, in and of itself, in no way forms an "agreement."

232.   Yet, despite the fact Taylor was not "consenting" to being regulated, Taylor

got charged criminally and Taylor's van stolen by a law enforcement officer

within SHELBY's scope of duty to train.

233.   Moreover, the clerks charged Taylor *"criminally"* for breach of an agreement

that never existed.

234.   Instead of teaching the actual workings of the "transportation" system to the

"transportation" enforcement personnel and to the clerical staff, the actual

mechanics of that system are kept away from the enforcement officers and

clerical staff, and that is very intentional.

235.   It's the lack of training that causes the rights violations.  Law enforcement

officers are not attorneys.  Clerks aren't attorneys. They depend on training

to understand the duties and limits of their office.  Since neither a reasonable

and prudent officer nor a reasonable and prudent clerk would in any way

charge criminally a party against whom there's facially no evidence, or even

Probable Cause, it follows that the training fails to inform the law

enforcement officers and the clerks the commercial nexus dependent nature

of not only the TRANSP. CODE but also the provisions regarding court

appearances, including the different between "failure to appear" and simply

"not showing up."

236.   *If the training were complete, each trained party would be very well aware*

---

that intimidation or harassment of someone for his/her assertion of a right, including the right not to contract, is a federal offence. *See* 18 U.S.C. § 242. Each trained party would also be very well aware that where two or more people are involved in such activity, that what's being committed against that party not engaging in "transportation" is a conspiracy to violate rights that is punishable by up to 10 years in the federal lock-up. *See* 18 U.S.C. § 241.

237.  Actual damages: For actual damages for failure to train regarding the right not to contract / agree / consent, Taylor demands one million dollars for each "charge" (case) against Taylor, for each is 100% dependent on the existence of a viable commercial nexus, and one million dollars for the theft / seizure of Taylor's van, which wouldn't have happened had there been adequate training regarding the reality that "transportation" enforcement, especially in the *non*-commercial setting, is 100% dependent on the consent of the "target." That total is six million dollars ($6,000,000).

238.  Punitive damages: Given that the failure to train is intentional and/or deliberately indifferent, Taylor also demands the same amount in punitive damages, six million dollars ($6,000,000).


Failure to train / supervise – violation of right not to exercise a privilege.

239.  Clearly, CITY has failed to train it's "transportation" enforcement personnel. Thus, some more specifically, CITY's Attorney, SHELBY, has failed to train

CITY's "transportation" enforcement personnel.

240. "Everyone" knows that "driving" is a "privilege."

241. The right not to exercise a privilege is clearly established.

242. Since Taylor was charged four times in response to his exercise of his right not to exercise the privilege of "driving," Taylor's right not to exercise a privilege was violated.

243. "Transportation"-based tickets are issued in usual and recurring circumstances.

244. Regarding inadequate training or inadequate supervision, either each party who acts under color of law and office knows what s/he is talking about or s/he doesn't. Here, not one of them did. Where these non-attorneys don't understand the laws they're hauling off and charging people as violating, then there's at least a training problem. Where this difference doesn't matter, as a general policy, then we're talking deliberate indifference, meaning that there's *also* a supervision problem, or else a problem with training the supervisor.

245. Deliberate indifference is the cause of the inadequate training.

246. SHELBY knew or should have known that "driving" is a "privilege," hence, that some people don't intend to exercise that "privilege." Moreover, he knew or should have known that "transportation" enforcement depends on "consent," especially in the *non*-commercial context, for it's a matter of the job *to* know, and ignorance of the law is no excuse or justification. Even the Tex.

Penal Code distinguishes "transportation" and "travel." *See* § 46.02

(unlawful[ly] carrying weapons) and 46.15(b) (§ 46.02 "does not apply" where

the person "is traveling"). Yet, despite the fact Taylor was *not* exercising the

privilege of "driving," Taylor got charged criminally and Taylor's van stolen.

The actual workings of the "transportation" system are kept away from the

enforcement officers, and that is very intentional.

247.   It's the lack of training that causes the rights violations.  Law enforcement

officers are not attorneys.  They depend on training to understand the duties

and limits of their office.  Since a reasonable and prudent officer would in no

way charge criminally a party against whom there's facially no evidence, it

follows that the training fails to inform the law enforcement officers not only

of the difference between "travel" and "transportation" but also of the

consequences for asserting factless criminal charges.

248.   If the training were complete, each law enforcement officer would be very

well aware that intimidation or harassment of someone for his/her assertion

of a right, including the right not to contract, is a federal offence. *See* 18

U.S.C. § 242.  Each officer would also be very well aware that where two or

more people are involved in such activity, that what's being committed

against that party not engaging in "transportation" is a conspiracy to violate

rights that is punishable by up to 10 years in the federal lock-up. *See* 18

U.S.C. § 241.

249.   Actual damages: For actual damages for failure to train regarding the right

not to exercise a privilege, Taylor demands one million dollars for each "transportation" "charge" (case) against Taylor, of which there were four, and one million dollars for the theft / seizure of Taylor's van, which wouldn't have happened had there been adequate training regarding the fact that some people don't want to exercise their "privilege" of "driving." The total is five million dollars ($5,000,000).

250. Punitive damages: Given that the failure to train is intentional and/or deliberately indifferent, Taylor also demands the same amount in punitive damages, five million dollars ($5,000,000).

### Violation of right of access.

251. These last two claims, for now, focus specifically on matters for which all conspirators are absolutely liable, due to the general laws about conspiracies, but regarding which the *proper* focus is on the main malefactors.

252. Parties liable. STEWART, CLARK, MAZZANT, and NOWAK.

253. Liability is joint and several.

254. This rights violation claim is a conspiracy claim.

255. Each of these four conspirators were in a position to stop the conspiracy involving the theft of Taylor's van, already actively "in progress" in the state system, but instead of stopping it, not only joined in but also aided and

abetted it by and means independent criminal acts "targeting" Taylor and acts perpetuating the actionable civil conspiracy, as well.

256.  Per 42 U.S.C. § 1983, and *Bivens*, the individuals are "persons."

257.  Each conspirator has acted under color of any statute, ordinance, regulation, custom, or usage of any State, Territory, or the District of Columbia, including those of CITY's, GRAYSON's, STATE's, and UNITED STATES's.

258.  By so acting under color of law, each conspirator has subjected or has conspired to subject Taylor, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, namely the fundamental right of access to the assigned § 451 judge.

259.  Taylor had one month in which to "appear" in the muni. court, via some form of initial filing, in order to satisfy the "agreement" in the "ticket" regarding that initial appearance.  But, where did Taylor invest his time?  Into the prep of the documents needed for filing the matter in the U.S. trial court.

260.  When he finally had enough of the suit in equity ready for filing, Taylor had about a week left to satisfy the muni. court appearance deadline. Translation: given the limited resource of time, Taylor's investment went into the U.S. trial court matter, the objectives of which were to mitigate the damages of the *state system's officers and officials* and to get Taylor's van back in time to keep this from turning into exactly what it's turned into.

261.  By "referring" Taylor's "civil case," which labeling intends to distinguish it

from an "administrative appeal," "at filing," no less, CLARK denied Taylor's access to the assigned § 451 judge.

262. It's CLARK's signature on the then-active "standing order" that actually "referred" (*pro se*) "civil cases" at the instant of filing.

263. As the Chief Judge of the trial court, CLARK certainly had authority to set standing referral policy for those matters *lawfully* subject to magistrate participation the instant such matters are filed.

264. However, that set of matters does not now include and has never included "civil cases."

    a.    There's no signature authority, i.e., (personalized) *jurisdiction*, to refer "civil cases" "at filing."

    b.    Unless all plaintiffs do what Taylor did, which was document non-consent in the case style, i.e., on page one of every document filed, starting with the Original Complaint, there's no way to know "at filing" what even the *plaintiff's* position is regarding magistrate participation, much less the position of any of the *parties respondent*.

    c.    Even the applicable procedures, § 636(c), call for at least two of what Taylor calls "solicitations" from the court, whether by the Clerk, the assigned judge, or the designated magistrate, for consent before the issue of referral is even possible to analyze.

    d.    In this context, it's simply noted that given the change from Money to "funny money," circa 1965, "silence" developed a different meaning.

    i.     Where the congress intended, originally, that § 636(c) look to the Common Law for the understanding of "silence," "no consent,"

    ii.    what S.Ct.U.S. clarifies in *Roell* is that in "this state," "the State," "silence" now means "consent."

    iii.   The bottom line is that the party not consenting to magistrate participation has an affirmative duty to object.

265. Thus, by "ordering" "referred" Taylor's (*pro se*) "civil case" the instant it was filed,

    a.    not only in abject defiance of Taylor's overt non-consent, and

    b.    not only without first hearing from any of the parties Respondent, i.e., without even the remote intent of review of the Record prior to formulating a conclusion about "unanimous consent,"

    c.    but also not as the judge  assigned to the case, and

    d.    in flagrant defiance of § 636(b)(1)(A), which overtly disallows referral of matters in equity,

    e.    CLARK exercised jurisdiction he never had.

266. In that act of exercise of jurisdiction that CLARK never had, by "referring" anything to the unconsented-to magistrate, CLARK denied Taylor's access to the assigned § 451 judge.

267. NOWAK joined the conspiracy to denial of access by participating, at all.

268. Just *exactly* as with the facially errant "policy" of the "standing order" to "refer" all *pro se* filed "civil cases" "at filing," in the first place,

a.   which "standing order" "referral" policy *defies* the very notion of "unanimous consent," given that it's impossible to know what any party's perspective is, especially that of the party(ies) respondent, until hearing from that party, and

b.   which policy bulldozed Taylor's overt, "Page One" objections and assertions of non-consent,

c.   there are the facially obvious defects that

     i.   CLARK is not the assigned judge and

     ii.   § 636(b)(1)(A) overtly prohibits referral of matters in equity.

269.   Thus, NOWAK knew, not just "should have known," but knew, as a matter of law, that she had zero signature authority to participate, but she participated just the same.

270.   Taylor filed multiple motions to strike and assertions of his objection to magistrate participation.

271.   MAZZANT joined the conspiracy to deny access to the assigned § 451 judge, which was himself, by denying every motion to strike and objection to magistrate participation that Taylor had filed.

272.   MAZZANT went on to prove, in spades, the very problems Taylor raised in and by his Motion to Disqualify and Transfer, by denying that motion. MAZZANT's message is plain and basic:  In E.D.Tex., *pro se* litigants have no rights, starting with the rights (1) not to contract / agree / consent to magistrate participation, thus (2) of access to the assigned § 451 judge.

273.   STEWART joined the conspiracy during his mishandling of the Judicial
Complaint proceedings.

a.   Rather than going to the Grand Jury, Taylor filed a Judicial Complaint
regarding the addiction to criminal violations engaged by the bench in
E.D.Tex., starting with CLARK, MAZZANT, and NOWAK.

b.   During that Judicial Complaint process, STEWART witness-tampered
Taylor by characterizing Taylor's underlying suit in equity as
"frivolous."

c.   Not knowing for certain whether STEWART had seen the two "no
jurisdiction" rulings out of Taylor's Walker County case, Taylor
supplied those.

d.   STEWART never changed his position.

e.   Thus, even though Taylor **proved**, to STEWART, via the "no
jurisdiction" rulings in Taylor's favor, which rulings **prove** that no trial
court (in TEXAS or anywhere else, for that matter) has either subject
matter jurisdiction or personal jurisdiction over a "transportation"-
based matter where there's "no evidence" of "transportation" and "no
evidence" of "consent," that *no state court*, including the muni. court
and the count court sitting in Sherman, ***had jurisdiction***, STEWART
never altered his message, which was plain and basic:  it was
"frivolous" for Taylor to come to the U.S. trial court expecting one
shred of respect for his rights, both regarding himself and regarding

his property.

f.     Moreover, STEWART, by intentionally and falsely characterizing

Taylor's underlying suit as "frivolous," fully intended to shut Taylor

up, and to harass, intimidate, and/or retaliate against Taylor, for

Taylor's assertion of his right not to contract / agree / consent

    i.     not only to "transportation" regulatory authority, as was/is the

focus of the state court matters, namely that STATE had no

commercial nexus to enforce against Taylor for *any* "transporta-

tion" based matter, thus that no trial court in the state system

had jurisdiction over the fact pattern in Taylor's case(s), thus

that it was an extremely *good idea for CITY to return Taylor's*

van to him immediately if not sooner,

      (1)    plus, there's always authority/jurisdiction to maintain

*status quo* in a matter; thus, even *if* "status quo" meant

that CITY retained possession of Taylor's van, that van

would remain under court supervision pending final

resolution of the matter, which is dismissal coupled with

Malicious Prosecution;

    ii.    but also to magistrate participation/arbitration, as was the focus

of the U.S. court matters, namely that no U.S. trial court had

authority to compel any objecting party to consent to magistrate

participation/arbitration, *especially* regarding dispositive

---

matters, and that the practice of such constitutes the commission of multiple, *felony* violations of Title 18, the chief violation of which is Sedition.

274. Given even STEWART's going off the rails in this matter, one might very comfortably conclude that the FBI/SPLC political indoctrination programme was even more than *STEWART* is able to filter out.

    a. This FBI/SPLC political indoctrination programme very plainly exists as a last ditch effort to "protect" the Achilles's Heel of the *entirety* of the Communist agenda in this country, which Achilles's Heel *is* the very notion of (commercial) "consent."

    b. The means of "protection" is that of systemic political stigmatization of *anyone* arguing "consent," especially of those doing it competently (no commercial nexus), by overtly libeling/slandering them as if they were part of those arguing it incompetently ("ambassadorial immunity").

    c. It's definitely "last ditch," and futile, given that President Trump is incrementally rolling back the Communist agenda by train-car loads by additional means.

275. Actual damages: For the denial of Taylor's access to the assigned § 451 judge, one million dollars ($1,000,000).

276. Punitive damages: Given the intentional, wanton, egregious nature of that violation of Taylor's right of access, one million dollars ($1,000,000) in punitive damages.

<u>Violation of right of Structural Due Process.</u>

277.   This the civil damages claim for what on the criminal side is called Sedition.

278.   Parties liable. STEWART, CLARK, MAZZANT, and NOWAK.

279.   Liability is joint and several.

280.   This rights violation claim is a conspiracy claim.

281.   Each of these four conspirators were in a position to stop the conspiracy involving the theft of Taylor's van, already actively "in progress" in the state system, but instead of stopping it, not only joined in but also aided and abetted it by and means independent criminal acts "targeting" Taylor and acts perpetuating the actionable civil conspiracy, as well.

282.   Per 42 U.S.C. § 1983, and *Bivens*, the individuals are "persons."

283.   Each conspirator has acted under color of any statute, ordinance, regulation, custom, or usage of any State, Territory, or the District of Columbia, including those of CITY's, GRAYSON's, STATE's, and UNITED STATES's.

284.   By so acting under color of law, each conspirator has subjected or has conspired to subject Taylor, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, namely the fundamental right of access to the assigned § 451 judge.

285.   Taylor had one month in which to "appear" in the muni. court, via some form of initial filing, in order to satisfy the "agreement" in the "ticket" regarding that initial appearance. But, where did Taylor invest his time? Into the prep

of the documents needed for filing the matter in the U.S. trial court.

286. When he finally had enough of the suit in equity ready for filing, Taylor had about a week left to satisfy the muni. court appearance deadline. Translation: given the limited resource of time, Taylor's investment went into the U.S. trial court matter, the objectives of which were to mitigate the damages of the *state system's officers and officials* and to get Taylor's van back in time to keep this from turning into exactly what it's turned into.

287. By "referring" Taylor's "civil case," which labeling intends to distinguish it from an "administrative appeal," "at filing," no less, CLARK denied Taylor's *access to the assigned § 451 judge.*

288. It's CLARK's signature on the then-active "standing order" that actually "referred" (*pro se*) "civil cases" at the instant of filing.

289. As the Chief Judge of the trial court, CLARK certainly had authority *to set* standing referral policy for those matters *lawfully* subject to magistrate participation the instant such matters are filed.

290. However, that set of matters does not now include and has never included "civil cases."

    a. There's no signature authority, i.e., (personalized) *jurisdiction,* to refer "civil cases" "at filing."

    b. Unless all plaintiffs do what Taylor did, which was document non-consent in the case style, i.e., on page one of every document filed, starting with the Original Complaint, there's no way to know "at

---

filing" what even the *plaintiff's* position is regarding magistrate participation, much less the position of any of the *parties respondent.*

  c.   Even the applicable procedures, § 636(c), call for at least two of what Taylor calls "solicitations" from the court, whether by the Clerk, the assigned judge, or the designated magistrate, for consent before the issue of referral is even possible to analyze.

  d.   In this context, it's simply noted that given the change from Money to "funny money," circa 1965, "silence" developed a different meaning.

   i.   Where the congress intended, originally, that § 636(c) look to the Common Law for the understanding of "silence," "no consent,"

   ii.   what S.Ct.U.S. clarifies in *Roell* is that "silence" now means "consent."

   iii.   The bottom line is that the party not consenting to magistrate participation has an affirmative duty to object.

291.   Thus, by "ordering" "referred" Taylor's (*pro se*) "civil case" the instant it was filed,

  a.   not only in abject defiance of Taylor's overt non-consent, and

  b.   not only without first hearing from any of the parties Respondent, i.e., without even the remote intent of review of the Record prior to formulating a conclusion about "unanimous consent,"

  c.   but also not as the judge  assigned to the case, and

  d.   in flagrant defiance of § 636(b)(1)(A), which overtly disallows referral

of matters in equity,

    e.    CLARK exercised jurisdiction he never had.

292.    In that act of exercise of jurisdiction that CLARK never had, by "referring" anything to the unconsented-to magistrate, CLARK denied Taylor's access to the assigned § 451 judge.

293.    NOWAK joined the conspiracy to denial of access by participating, at all.

294.    Just *exactly* as with the facially errant "policy" of the "standing order" to "refer" all *pro se* filed "civil cases" "at filing," in the first place,

    a.    which "standing order" "referral" policy *defies* the very notion of "unanimous consent," given that it's impossible to know what any party's perspective is, especially that of the party(ies) respondent, until hearing from that party, and

    b.    which policy bulldozed Taylor's overt, "Page One" objections and assertions of non-consent,

    c.    there are the facially obvious defects that

        i.    CLARK is not the assigned judge and

        ii.    § 636(b)(1)(A) overtly prohibits referral of matters in equity.

295.    Thus, NOWAK knew, not just "should have known," but knew, as a matter of law, that she had zero signature authority to participate, but she participated just the same.

296.    Taylor filed multiple motions to strike and assertions of his objection to magistrate participation.

297.   MAZZANT joined the conspiracy to deny access to the assigned § 451 judge, which was himself, by denying every motion to strike and objection to magistrate participation that Taylor had filed.

298.   MAZZANT went on to prove, in spades, the very problems Taylor raised in and by his Motion to Disqualify and Transfer, by denying that motion. MAZZANT's message is plain and basic:  In E.D.Tex., *pro se* litigants have no rights, starting with the rights (1) nòt to contract / agree / consent to magistrate participation, thus (2) of access to the assigned § 451 judge.

299.   STEWART joined the conspiracy during his mishandling of the Judicial Complaint proceedings.

   a.   Rather than going to the Grand Jury, Taylor filed a Judicial Complaint regarding the addiction to criminal violations engaged by the bench in E.D.Tex., starting with CLARK, MAZZANT, and NOWAK.

   b.   During that Judicial Complaint process, STEWART witness-tampered Taylor by characterizing Taylor's underlying suit in equity as "frivolous."

   c.   Not knowing for certain whether STEWART had seen the two "no jurisdiction" rulings out of Taylor's Walker County case, Taylor supplied those.

   d.   STEWART never changed his position.

   e.   Thus, even though Taylor **proved**, to STEWART, via the "no jurisdiction" rulings in Taylor's favor, which rulings **prove** that no trial

court (in TEXAS or anywhere else, for that matter) has either subject matter jurisdiction or personal jurisdiction over a "transportation"-based matter where there's "no evidence" of "transportation" and "no evidence" of "consent," that *no state court*, including the muni. court and the count court sitting in Sherman, *had jurisdiction*, STEWART never altered his message, which was plain and basic:  it was "frivolous" for Taylor to come to the U.S. trial court expecting one shred of respect for the law or his rights, both regarding himself and regarding his property.

f.   Moreover, STEWART, by intentionally and falsely characterizing Taylor's underlying suit as "frivolous," fully intended to shut Taylor up, and to harass, intimidate, and/or retaliate against Taylor, for Taylor's assertion of his right not to contract / agree / consent

  i.   not only to "transportation" regulatory authority, as was/is the focus of the state court matters, namely that STATE had no commercial nexus to enforce against Taylor for *any* "transportation" based matter, thus that no trial court in the state system had jurisdiction over the fact pattern in Taylor's case(s), thus that it was an extremely good idea for CITY to return Taylor's van to him immediately if not sooner,

   (1)   plus, there's always authority/jurisdiction to maintain *status quo* in a matter; thus, even *if* "status quo" meant

---

that CITY retained possession of Taylor's van, that van would remain under court supervision pending final resolution of the matter, which is dismissal coupled with Malicious Prosecution;

ii.   but also to magistrate participation/arbitration, as was the focus of the U.S. court matters, namely that no U.S. trial court had authority to compel any objecting party to consent to magistrate participation/arbitration, *especially* regarding dispositive matters, and that the practice of such constitutes the commission of multiple, ***felony*** violations of Title 18, the chief violation of which is Sedition.

300.   The fundamental reason the prohibitions on "referral" authority exist, as documented in § 636(b)(1)(A), which is *unnecessary* language (i.e., it's essentially "Structural Due Process for Dummies"), is that where the magistrate, especially the unconsented-to magistrate, *rules on dispositive matters*, the result is that the entire case has been turned over to the magistrate.

301.   Since magistrates are not judges, but, instead, are merely arbiters, the act of sending a dispositive matter out the back door of the courthouse and over to *the arbiter for disposition is an act of compelling arbitration.*

302.   Of the several fundamental rights still being recognized, a right to trial is one of them.

---

303.  The Judicial Branch, and the judicial Power, starting even with the 1789 Judiciary Act, have been designed around respect for and protection of the right to trial.

304.  The act of compelling arbitration of trial matters constitutes Sedition.

   a.  Court "orders" constitute "force."

   b.  The right to trial is foundational to the very structure of the Judicial Branch.

   c.  To order arbitration, especially on dispositive matters, all the more especially in defiance of any party's overt objection to such arbitration, is to intend to overthrow the very structure of the Judicial Branch.

305.  The only people with the authority to restructure the Judicial Branch and redesign the judicial Power are either the congress or the People at large.

306.  Thus, CLARK, MAZZANT, and NOWAK have very boldly committed Sedition by numerous acts, thereby also, and simultaneously, violating Taylor's right to Structural Due Process.

307.  Actual damages:  For *defying* Taylor's right to Structural Due Process, ten million dollars ($10,000,000).

308.  Punitive damages: Given the intentional, wanton, depraved, egregious, unconscionable nature of this tort, fifty million dollars ($50,000,000) in punitive damages, as well.

## Request for Relief

Wherefore, Premises Considered, Taylor requests relief as follows:

309.   Grant the relief demanded in the Complaint.

310.   Award costs.

311.   Grant any and all other relief, at law, in equity, or sui generis, to which

Taylor may show himself justly entitled.

Respectfully submitted,

/s/ Harmon Taylor
HARMON L. TAYLOR
H.L. Taylor Farms
225 Old Patterson Road
Howe, Texas  75459
wtpvb@earthlink.net

## § 1746 Declaration – HARMON L. TAYLOR

Per 28 U.S.C. § 1746, and under the laws of perjury of the United States, I, HARMON L. TAYLOR, depose and declare (or certify, verify or state), that I am at least 21 years of age, that I am competent to make this Affidavit / Declaration, that I have personal knowledge of these facts, and that these facts are true and correct.

The facts asserted in this Original Complaint are true and correct.

The Exhibits are proved up with the Declaration associated with that set of documents, filed under separate cover.

Further, Declarant sayeth not.

Executed on this the 17th day of February, 2020

/s/ Harmon Taylor
HARMON L. TAYLOR, Declarant

## Certificate of Service

Service of this Original Complaint will be accompanied by the Summons document(s).

/s/ Harmon Taylor
HARMON L. TAYLOR